## PEOPLE *v.* ALLEN.

1. CRIMINAL LAW—REMARKS OF PROSECUTOR—PREJUDICE.

  Prosecutor's remarks in trial of 2 defendants for attempted breaking and entering in the nighttime *held*, not fatally prejudicial or entirely without provocation, where it appears that defense argument to jury indicates that very little of the prosecution or any of its witnesses was approved but were variously labeled therein as unfair, falsifiers, or outright liars, and although the prosecutor's remarks may have been intemperate and better left unsaid, the defense counsel who makes accusations and creates inferences of unfairness and unprofessional conduct against the prosecution is not in a position to ask reversal because of equally intemperate language used in reply (CL 1948, §§ 750.92, 750.110).

2. SAME—VOIR DIRE—QUESTION AS TO EVENLY-BALANCED TESTIMONY.

  Claimed error of trial court in refusing to ask each juror during *voir dire* examination what his verdict would be if he found the testimony evenly balanced *held*, not reversible error, under record presented which failed to show just what other things the jurors were asked on this subject either by the court or counsel; the Supreme Court declining to guess whether the trial judge may have abused his discretion and not assuming that the trial court failed to ask the usual questions about their willingness to apply the traditionally prevailing rules of law on the burden of proof, presumption of innocence, and reasonable doubt (Court Rule No 37 [1945]).

3. SAME—INTENT—EVIDENCE OF OTHER OFFENSES.

  It was not error on part of trial court to admit into evidence on trial of defendants, charged with attempted breaking and entering in the nighttime, proof of the commission of the crime of safebreaking in a supermarket and defendants' connection with it as proof of intent or motive, where testimony by one of the defendants made the question of motive and intent material (CL 1948, §§ 750.92, 750.110, 768.27).

REFERENCES FOR POINTS IN HEADNOTES

[1] 53 Am Jur, Trial § 468.
[2] 31 Am Jur, Jury §§ 106, 107.
[3, 4] 20 Am Jur, Evidence § 309 *et seq.*
[5] 20 Am Jur, Evidence §§ 317, 318.
[8] 14 Am Jur, Criminal Law § 129 *et seq.*

**4. SAME—OTHER OFFENSES—SUFFICIENCY OF PROOF.**

The people are required to show that beyond a reasonable doubt the defendant is guilty of the crime with which he is charged, but evidence of other offenses, introduced for purpose of showing motive or intent, is admissible if it tends to show the defendant guilty thereof (CL 1948, § 768.27).

**5. SAME—ATTEMPTED BREAKING AND ENTERING IN NIGHTTIME—EVIDENCE—OTHER OFFENSES.**

Claim that verdict of guilty in prosecution for attempted breaking and entering in the nighttime was against the great weight of the evidence in that certain evidence connecting defendants with another similar offense should not have been received in the absence of testimony directly connecting defendants with the other offense and the presented indicia thereof *held*, without merit, where defendants were shown to have been connected with the other offense by circumstantial evidence even without exhausting all scientific means that might have been used (CL 1948, §§ 750.92, 750.110, 768.27).

**6. SAME—WEIGHT OF EVIDENCE—ADMISSIBILITY.**

The fact that more elaborate tests than were made might have been made in scientific showing of defendants' connection with crime charged and another similar one would affect the weight, not the admissibility of the evidence (CL 1948, § 768.27).

**7. SAME—REBUTTAL.**

A defendant in a criminal case need not prove his innocence but if he is dissatisfied with the people's proofs on a given point, he can fairly be expected, before being heard to complain, to make some sort of rebuttal move in his own behalf.

**8. SAME—ATTEMPTED BREAKING AND ENTERING IN THE NIGHTTIME.**

Evidence adduced in prosecution for attempt to break and enter in the nighttime *held*, to have been presented in such a manner as to afford defendants a fair trial (CL 1948, §§ 750.92, 750.110).

Appeal from Ingham; Salmon (Marvin J.), J. Submitted April 11, 1957. (Docket No. 42, Calendar No. 46,334.) Decided March 6, 1958.

William H. Allen and Frank J. Smith were convicted of attempted breaking and entering in the nighttime. Affirmed.

*Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Jack W. Warren,* Prosecuting Attorney, for the people.

*Stuart J. Dunnings, Jr.,* for defendants.

VOELKER, J. The defendants were charged jointly with attempted breaking and entering in the night-time* and they appeal from their conviction below, alleging numerous errors during their trial. The background of this case is as follows:

Defendants Allen and Smith were observed by a Lansing policeman, Holmes, walking south on a street in Lansing around 1:30 a.m., on January 2, 1954. The officer observed them stop in front of Nasiff's Bar on South Washington avenue; as he later testified at the trial, he shortly heard the sound of splintering wood; he fired some shots and called out to the defendants, who fled, but were apprehended several blocks away. Other officers joined Officer Holmes and to the officers, Allen and Smith claimed that they had come from Ohio looking for work in Michigan; that they arrived in Lansing on December 31, 1953; that they did not find work; that they had started hitch-hiking for Detroit and become lost and had finally found themselves in front of the lighted bar in question; that they did not know the establishment was closed; that they tried the door and found it locked, whereupon they heard someone shout "hey you," whereupon they heard 2 pistol shots which, as Allen later testified at the trial, so frightened them that they fled, not knowing who was shooting or why.

The defendants were also asked by the police what they did with the crowbar and Smith replied that he threw it behind a house. The next morning

---

* See CL 1948, §§ 750.92, 750.110 (Stat Ann §§ 28.287, 28.305).— REPORTER.

Lansing police officers found a wrecking or crowbar hanging from some shrubs in a yard in the vicinity where the defendants were apprehended, whereupon both defendants denied to the police that they had any crowbar or that they had ever seen the bar which was found. Defendants complain that there was no showing that the occupants of the house where the bar was found were ever asked by the police if they owned the bar. Defendants fingerprints were not found on the bar. At the trial the officers testified substantially to the foregoing. Officer Holmes did not claim to have seen any bar in their hands or elsewhere as they stood in front of Nasiff's Bar, but he said he assumed they had one in order to splinter the door.

It further appears that some time between the hours of approximately 10 p.m. on January 1, 1954, and 6 a.m. the next day (the hours it was closed) a supermarket some 6 miles from Nasiff's Bar was broken into and about $1,500 taken from a jimmied safe. At the trial of this case the prosecution offered evidence of that offense for the general purpose of showing intent and motive and common plan in connection with the charge for which defendants were being tried. Part of the evidence offered bearing on the prior offense was substantially as follows: 11 photographs of the supermarket showing the establishment disarranged and the safe broken into; a photograph of the heel print of a shoe found near the safe in the supermarket; a pair of gloves and the shoes worn by Smith when he was apprehended; the gloves worn by Allen at the same time; portions of the locking mechanism of the safe; and the door and door paneling, whether from the bar or the supermarket not clearly appearing from the record. All this evidence and these exhibits were objected to by the defense but were admitted and received in evidence.

Merle Woodward of the Michigan crime detection laboratory also testified for the prosecution over objection that he made certain "scratch" tests on a lead bar with the wrecking or crowbar recovered by the Lansing police; that these were then photographed and compared with photographs taken of scratch marks on the supermarket safe and that there were 21 points of similarity and that in his opinion they were made by the same instrument. On cross-examination he admitted that he also found dissimilar scratch marks. The defendants complain that no proof was offered that dissimilar bars might not have left similar marks.

A detective from Ohio testified that on January 6, 1954, he searched a car owned by the defendant Allen in Hamilton, Ohio, and found, among other things, a plaid cap. (Both defendants were then in custody in Michigan.) Found on this cap were particles of metal. This cap was admitted in evidence over objection. In this connection Merle Woodward further testified that the wrecking bar recovered by the Lansing police had paint on it similar in color and type to that on the safe at the supermarket. He made his examination under a microscope. He testified that he made no chemical analysis. Proof was also offered and received over objection that a microscopic examination showed that the metal particles on the cap found in Ohio appeared to be made of a brass similar to that found on the safe. Defendants complain, and offered some proof below, that neither the similarity in paint nor metal could exactly be determined except by chemical analysis.

Merle Woodward also testified that he examined under a microscope a photograph of the heel print found at the supermarket "job" and compared it with the heel of Smith's shoe and found 3 areas of similarity. Defendants complain of this that it

failed to show a resemblance to the center of Smith's shoe; that the prosecution had likewise failed to show that the prints were the same size; and further that there were still other heel prints found at the supermarket scene which were different from the heels of the shoes of either defendant. The defense also brought out testimony tending to show that the supermarket safe could not have been damaged to the extent it was with the wrecking bar alone. No other devices or tools were recovered by the police from Allen's car in Ohio. Defendants also complain that the people failed to show that Allen's car had ever been in Michigan.

At the conclusion of the people's proofs the defense made a motion for a mistrial on the grounds of the improper offer and reception of evidence, especially as bearing on another or prior offense. This motion was denied, renewed again at the close of all proofs, and again denied. Defendants urge here that these and other errors below were fatal and must result in a reversal. Among other claimed errors was the following argument made to the jury by the prosecution and to which defendants objected:

"I think I am going to get down to calling a spade a spade. I am going to do so with Mr. Dunnings. During this argument he has gone on the assumption everybody in this case is a fraud, a falsifier, and a fabricator, and his man over here is telling the truth. Everybody else is a liar except his man. I don't like that. That is dishonesty of the highest order and it is improper. He knows it isn't true, and these police officers, the fact that every one does not testify exactly alike is the best proof in the world they are telling the truth, that they didn't put any stories together to try to convict anybody.

"I want to point out a few things. I want to point out this much, that when Mr. Dunnings leaves or

tries to leave the impression in the mind of the jury that he couldn't get a chemical analysis and bring them in here off our samples, that is 100% fabrication.

*"Mr. Dunnings:* I object to that. There has been no such impression attempted. We had no such burden of proof in any event. That is improper argument. I never once stated I couldn't; I admitted I could if I wanted to but we had to prove nothing. That is improper.

*"The Court:* All right.

*"Mr. Younger:* No, he doesn't have to prove anything, but the point of it is he can prove it if he wants to. Now he is not fooling me one little bit. He couldn't prove it and I know he couldn't prove it, because if he could he would have done it. * * *

"Dunnings knows in his own mind and heart if he would compare them (paint on bar and paint on the safe) they would be the same as on that safe. That is the answer. He knows what they would show if they ever compared them. And don't you think for a minute if those 2 fellows were innocent, and you don't need to be a lawyer to figure this out, let us show the 2 steps he lays up here for the defense of his clients. First that the chemical analysis can be made. He is the man who is the confidante of these 2 men over here, and he would know from his talk whether they were guilty or not, and if they weren't—

*"Mr. Dunnings:* (Interposing) I object to that as being improper as to what I know whether these fellows are guilty or not from the way I talked to them. Definitely improper, and it would lead the jury to believe the prosecutor has something I don't know about, that has not been testified to. I am not on the stand. I haven't testified.

*"The Court:* I would omit that, Mr. Younger.

*"Mr. Younger:* There isn't any police officer or any prosecutor or any human being that ever walked on the face of the earth that would suit Mr. Allen, and when I get to the position where I do my work,

and I will admit my work is not perfect by a long ways, and for the officers, I will admit their work is not perfect, but when I get to the point where people like Mr. Dunnings, where I have to please him, I don't want to have anything to do with prosecuting criminals in Ingham county.

"*Mr. Dunnings:* That is improper argument, what is he trying to do to please me.

"*The Court:* Omit that too, Mr. Younger."

Following this contretemps the prosecution in its further argument also alluded to certain charges made by the defense in its argument that the Lansing police were lying over whether they had or had not made a written report of the instant case. On this subject defense counsel first had this to say:

"I think this is 'most significant; Sergeant Croy said he made a written report to the captain but that report was not in the courtroom, and do you know why it wasn't in the courtroom? Because the true facts are as stated by Sergeant King. They did not make a written report. Falsifying again? Why? Why? The prosecutor will tell you that if I want these records I can subpoena them. Ladies and gentlemen, again I tell you we have to prove nothing."

The prosecutor delivered himself on this subject as follows:

"Now Mr. Dunnings talks about reports. The fact Officer King said he didn't make out a report or Croy didn't, he concludes no report was made out or they didn't have them in here, and for that reason something is being falsified. Ladies and gentlemen, the honest way for him to find out is to serve a subpoena on the chief of police and bring it in here, because the officers must testify orally. They cannot read any reports. The law does not permit them to read a report in front of a jury. All I ask of Mr. Dunnings, is this: Let us play this

thing honest. If he wanted those reports he could have subpoenaed those from the chief of police to find out if there were or weren't any, but let us not wait until the case is over and start to criticize somebody for something he didn't try to find out himself. That is not honest. That is not fair."

Defendants now urge that the foregoing quoted remarks by the prosecutor during his argument constituted fatally prejudicial and reversible error. They quote only the foregoing portion of the defense argument in their brief, but we believe that the remarks of the prosecutor must, where possible, be considered in the light of the entire burden of the defense argument which may have prompted them. We find here that for some reason the entire jury argument of the defense is set forth in the record. We have read it, and while no useful purpose would be served in quoting all of it, it is not unfair to say that it discloses very little about the prosecution or any of its witnesses of which the defense approved. In fact most of the people's witnesses were variously labeled in the defense argument as unfair, falsifiers, or outright liars. The following excerpts are typical:

"Falsifying again? Why? Why? * * * If they lie about that they may falsify the report. If they falsify about making one, I don't know what else they might do. * * * The prosecutor knew those statements were made but he didn't bring the report in here. * * * Officers of the law falsifying? What have they to gain? That is what he [the prosecutor] wants you to believe. * * * Now these are officers investigating, prosecuting the guilty, and overlooking the facts in favor of the innocent. * * * But the bad part about it, when you start to falsify, one calls for another. * * * Now why should [naming an officer] falsify about the gloves? * * * Falsify about the color of the

shirt? * * * Falsify about a statement made to him back in Ohio? * * * You saw the way he [referring to a people's expert witness] tried to be evasive, the way he wouldn't give me direct answers. * * * The prosecutor can't pick out his facts but he left out a lot of things today."

There is more of the same, much more, but we think we have quoted enough to project the true climate in which the prosecutor made the statements now complained of.

We concede that there is little room for argument that his remarks were intemperate and perhaps better left unsaid. But under all the circumstances we cannot say that they were fatally prejudicial or entirely without provocation. Criminal trials are not basket luncheons, and we seem faintly to recall that in our experience opposing lawyers rarely if ever pelted each other with rose petals. In any case, counsel for defendants cannot on his side be allowed great latitude to goad and provoke adverse comment or criticism from the prosecutor and then seek a reversal because his strategy succeeded. When opposing counsel makes accusations and creates inferences of unfairness and unprofessional conduct against the prosecution, he is scarcely in a position to ask a reversal because of equally intemperate language used in reply. To permit that would be to award victory to those criminal defendants retaining the best "needler." Under the circumstances presented here we must hold that this ground of error is without merit. (See, generally, 2 Gillespie, Michigan Criminal Law and Procedure [2d ed], § 626.)

Another ground of error relied on by defendants is the refusal of the trial court upon request of defense counsel to ask each juror during the *voir dire* examination the following question: "What his or her verdict would be if he found the testimony

evenly balanced?" We think this ground of error
is probably answered against defendants by our
decision in *People* v. *Lockhart,* 342 Mich 595. We
say probably because the record here, prepared at
the instance of the defense, does not indicate just
what other things the jurors *were* asked on this
subject either by the court or by counsel. In the
absence of such a showing we cannot assume that
the court failed to ask the jurors substantially simi-
lar questions, including the usual questions about
their willingness to apply the traditionally prevail-
ing rules of law on the burden of proof, presumption
of innocence and reasonable doubt. Nor, lacking
such a showing, are we disposed to guess whether
the trial judge may have abused his discretion under
Court Rule No 37 (1945).

Another and possibly the most serious ground of
error urged is the offer by the people and the admis-
sion by the trial court of evidence tending to show
the commission of and the defendants' connection
with another offense, namely the safebreaking at
the supermarket. It is urged that this other offense
was not sufficiently related to and connected with
the offense charged so as to tend to establish intent
or motive; that the people failed to establish beyond
a reasonable doubt defendants' guilt of that other
offense; and that the defendants were thereby
caused to be tried for 2 offenses at the same time
to their great prejudice and in violation of their
constitutional rights.

The statute (CL 1948, § 768.27 [Stat Ann 1954 Rev
§ 28.1050]) provides as follows:

"In any criminal case where the defendant's mo-
tive, intent, the absence of, mistake or accident on
his part, or the defendant's scheme, plan or system
in doing an act, is material, any like acts or other
acts of the defendant which may tend to show his
motive, intent, the absence of, mistake or accident

on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant."

At this point it should be observed that the defendant Smith did not testify below but that Allen did, during which, among other things, he denied any attempt or intent by him and his companion to break into the tavern or their possession of any wrecking bar. He also claimed that any brass particles found on his cap had come from a factory job he had held in Ohio where he came in contact with metal particles. While we do not hold that denial by a defendant is in every case a necessary prelude to admissibility of such proofs under the statute, it would appear that the defense in this case thus clearly made the question of motive and intent material and thereby equally clearly opened the door to precisely the sort of proof offered by the people to controvert that claim. If this is so it would follow that proof of heel marks, that particles of brass in the cap were similar to that found on the safe, and that the same wrecking or crowbar found near the tavern was used at the supermarket would all be rather material to rebut and refute that claimed lack of motive or intent or common plan, and this despite the fact that such proof might tend to show the commission of another offense. If this is not the sort of situation for which the statute was designed we are offhand at loss to imagine one that is.

But, urge the defendants, in any case the other offense, if shown, must be shown to have been committed beyond a reasonable doubt and, further, this Court has said in *People* v. *Davis,* 343 Mich 348,

365, that evidence of prior offenses may be admitted "only if the jury is first convinced" that they were perpetrated by the defendant. We think that the language quoted from the *Davis Case* is a far cry from that case holding either that the people must show beyond a reasonable doubt that such other offense was committed or that the defendants were guilty thereof. In any case all that the statute requires by its terms is that the like acts "may tend to show" motive or intent or the other things there enumerated and it significantly concludes: "notwithstanding that such proof may show or *tend to show* the commission of another or prior or subsequent crime by the defendant." (Italics added.) It is only for the crime with which they were charged that the people are required to prove the defendants' guilt beyond a reasonable doubt. This claimed ground of error is without merit. In view of the foregoing we must also hold that the defendants' further claim that the court's charge to the jury on this score was inadequate is equally without merit.

Most of the remaining errors raised by the defendants may be considered together. They are raised under the general claim that the verdict of the jury was contrary to the weight of the evidence. Most of these claims have to do with the admissibility of evidence or exhibits, in turn mostly having to do with the supermarket offense. Among other things it is claimed that Allen's cap could in no case be received in evidence—or the brass filings found on it—unless the people showed that the car in which the cap was found in Ohio had left there and been connected with the tavern offense; that it was fatal error for the people to have failed to make chemical analyses of the paint and the brass; that evidence of the heel mark was inadequate and in any case should not have been admitted because other unidentified heel marks were found at the supermarket;

because the money taken from the supermarket was never recovered or traced to these defendants; because the police did not see any crowbar in possession of defendants at the tavern; because the police failed to ask the householder if the recovered crowbar was his; and because the police reports were not produced in court.

We think none of these claimed errors are meritorious. The possibility seems entirely to have escaped the attention of counsel for the defendants that a third man could well have been in on the supermarket job and driven the Allen car and his cap—not to mention the money and any other burglar tools—back to Ohio. In any case the people need not prove these things once the connection of the defendants with that other offense was properly made. As for the apparent claim that it was the duty of the people to have exhausted all scientific means in order to show the similarity in the scratches and paint on the bar and the safe, and the brass particles on the cap and the safe, we do not believe that to be the law. To hold thus would be virtually to banish all circumstantial or physical evidence from our law.

While there was nothing to prevent the people from making more elaborate tests, if they wished, we think their failure to do so would go largely to the weight to be given their testimony, not to the question of its admissibility. Any other rule would place an intolerable burden upon the prosecution and the public in the prosecution of even the simplest crimes. For example, would every village constable henceforth be expected to appear in justice court with a flying wedge of scientists to prosecute a common drunk? Where would the people dare stop? Would they be obliged to follow science only up to the point of general judicial recognition or what? And who during the trial of a case would

be in a position to determine when that point was reached or exceeded? Would all trial judges henceforth be expected to act as scientific experts? If so, expert in what branches?

While the defendant charged with crime clearly never has to prove his innocence, there is manifestly a point in the trial of a case where if he is dissatisfied with the proofs made by the people on a given point, he can fairly be expected—at least before he will be heard to complain—to make some sort of rebuttal move in his own behalf. Most of the things complained of here under this ground of claimed error were more properly possible matter in rebuttal. For example, when a defendant tells the police he threw a burglar tool in a yard, and the police find it there, we do not think they must also scour the neighborhood to discover other possible claimants. That would more properly be left to the defense. Again, the respondents produced an expert in this case and yet this record is barren that they ever attempted to do any of the things or make any of the tests that they now complain the people fatally failed to do or make.

The finding of the crowbar near where one of the defendants admitted throwing it and linking it (and thereby the defendants) with the supermarket job was perhaps the crux of this case. It was the sesame that opened up the other proof further linking defendants to the supermarket offense. Far from the police failing to do a good job or taking advantage of these defendants, under this record they appear to have done quite the opposite. In fact a detached reading of the record shows that they did a painstaking, intelligent and thorough job, presenting their evidence in court with equally painstaking fairness, telling what they knew, candidly admitting what they didn't know, all the while laboring under defense provocation which may have made another

course perhaps more tempting than usual. We cannot see that these men were denied a fair trial. Their conviction must accordingly be affirmed.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, and EDWARDS, JJ., concurred.

KAVANAGH, J., took no part in the decision of this case.