PEOPLE v GEARNS

PEOPLE v THOMAS

Docket Nos. 101026, 107834. Argued November 5, 1997 (Calendar Nos. 8-9). Decided May 5, 1998.

Jeffrey A. Gearns was convicted by a jury in the Detroit Recorder's Court, Beverley Anne Jasper, J., of second-degree murder and possession of a firearm during the commission of a felony. The Court of Appeals, REILLY, P.J., and GRIFFIN and C. L. BOSMAN, JJ., affirmed in an unpublished opinion per curiam (Docket No. 151723). The defendant appeals.

Donnell L. Thomas was convicted by a jury in the Saginaw Circuit Court, Lynda L. Heathscott, J., of involuntary manslaughter, possession of a firearm during the commission of a felony, and carrying a concealed weapon. The Court of Appeals, WHITE, P.J., and D. E. HOLBROOK, JR., and P. D. SCHAEFER, JJ., reversed in an unpublished opinion per curiam (Docket No. 171264). The people appeal.

In each case, the defendant contends that his right to confront a witness was denied when the trial court permitted a prosecution witness to assert the Fifth Amendment privilege against self-incrimination in the presence of the jury; that the calling of the witness, knowing that he would assert his Fifth Amendment rights, amounted to prosecutorial misconduct, denying the defendant a fair trial or due process; and that these errors contributed to the guilty verdict.

In separate opinions, the Supreme Court held:

No constitutional error occurred in either case. While evidentiary error did occur, it was harmless because it is highly probable that, in the light of the strength and weight of the untainted evidence, the tainted evidence did not contribute to the verdicts.

1. A defendant has no right to confront a witness who does not provide any evidence at trial. Where a witness does not testify about matters beyond preliminary information, there is nothing for the defendant to cross-examine. A mere inference is insufficient. Thus, before a defendant can be denied effective cross-examination, some substantive testimony or its equivalent must come to pass. In these cases no substantive testimony was placed before the jury.

2. Prosecutorial misconduct occurs where the government makes a conscious and flagrant attempt to build its case out of inferences arising from a proffered witness' refusal to testify by invoking Fifth Amendment rights. However, prosecutorial misconduct alone does not require a new trial. The touchstone of due process analysis in such cases is the fairness of the trial, not the culpability of the prosecutor, i.e., did the prosecutor's conduct rise to such a level as to deny the defendant a fair trial in violation of due process? In these cases, however, the prosecutors did not attempt to build their cases on inferences drawn from a witness' assertion of the testimonial privilege. Once the initial assertion of the privilege occurred, each prosecutor ceased questioning the witness.

3. While evidentiary error occurred in each case, the people proved that it was highly probable that, in the light of the strength and weight of the untainted evidence, the tainted evidence did not contribute to the verdicts. Circumstantial evidence primarily comprised the case against each defendant. In *Gearns*, not only was the circumstantial evidence strong, the physical evidence connecting the defendant to the crime was substantial. In *Thomas*, strong evidence was presented, placing the defendant at the scene of the crime and establishing him as the shooter. In both cases, the error was harmless in the light of the strength and weight of the untainted evidence. Neither defendant was unfairly prejudiced.

Justice CAVANAGH, joined by Justice KELLY, concurring in part and dissenting in part, further stated that when the weight of the inferences erroneously placed before the jury is fully considered, it is highly probable that the tainted evidence contributed to the verdicts and that reversal is required.

Justice WEAVER, joined by Justice TAYLOR, concurring in part and dissenting in part, further stated that it was not error in these cases for the prosecutor to call witnesses intimately connected to the crimes at issue, knowing that the witnesses would make an invalid assertion of their Fifth Amendment rights. Error occurs only when the privilege asserted has been ruled to be valid by the trial court. If a prosecutor learns that a witness plans to claim a privilege, the proper procedure would seem to be to ask the court to conduct a hearing outside the presence of the jury, and rule on the validity of the privilege. If it is valid, the prosecutor could not call the witness unless nonprivileged information could be and was elicited, thereby giving purpose to the witness' appearance other than creation of the unwanted inference that the witness' testimony would undercut the defendant's claim of innocence. If the privilege is found invalid by the trial court, the prosecution has every right to put the witness on the stand, expecting the witness to comply with the obliga-

tion to testify. The prosecutor should be able to rely on the trial court's ruling regarding validity.

The majority disregards the fact that the evidentiary error in question is grounded in professional misconduct, relying on the prejudice to the defendant. This, however, confuses whether the error was harmless with whether error existed. In these cases, it is clear that neither witness was asserting a valid privilege. Thus, in neither case was there evidentiary error.

The proper standard for preserved, nonconstitutional error is set forth in MCL 769.26; MSA 28.1096. The defendant should have the burden of showing why the judgment should be overturned. It is presumed that the error is harmless, and the judgment should not be overturned unless, in the opinion of the court after an examination of the entire case, it affirmatively appears that the error resulted in a miscarriage of justice.

Justice BOYLE, dissenting, stated that because error, if any, is harmless under any standard, the majority has used this case as a vehicle to adopt the high-probability standard, rendering meaningful exploration of the question a futility.

The lead opinion takes precedent that rests on the dual concerns that a prosecutor should not force a witness to claim a valid privilege and that a jury may draw inferences that are impermissible from such exercise and converts it into a rule that the prosecutor may not call a witness who has no privilege to refuse to testify because the jury might hold it against the defendant. Concern that the witness' refusal to testify might play a role in the jury's deliberations harmful to the defendant is speculative, not evidentiary.

A jury is entitled to know that a witness has been produced and will not testify, rather than be told that it is not to speculate on the reasons why the witness is not present. A rule depriving the jury of knowledge in determining a defendant's guilt or innocence requires a compelling justification. Because there was no right to refuse to testify in these circumstances, no ethical violation by the prosecutor, and no legally cognizable prejudice to the defendant from the witness' recalcitrance, no compelling justification was present.

*Gearns*, affirmed.

*Thomas*, reversed.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *John D. O'Hair*, Prosecuting Attorney, *Timothy A. Baughman*, Chief, Research, Training and Appeals, and *Thomas M.*

*Chambers*, Assistant Prosecuting Attorney, for the people in *Gearns*.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Michael D. Thomas*, Prosecuting Attorney, and *Catherine Langevin Semel*, Assistant Prosecuting Attorney, for the people in *Thomas*.

*Mark J. Kriger* for defendant Gearns.

State Appellate Defender (by *Gail Rodwan*) for defendant Thomas.

BRICKLEY, J.

I

In these cases, we are called upon to determine three issues. First, whether any constitutional error occurred when the people called a witness to the stand knowing that the witness would assert the privilege against self-incrimination in front of the jury. Second, if this was not constitutional error, was it evidentiary error? Finally, if this was evidentiary error, we must decide the proper level of assurance a reviewing court must have for preserved nonconstitutional error. We conclude that no constitutional error occurred in either case and that, while evidentiary error did occur, it was harmless because it is highly probable that the evidence did not contribute to the verdicts in light of the strength and weight of the untainted evidence.

II

A. *PEOPLE v GEARNS*

Defendant Jeffrey Gearns was tried before a jury and convicted of second-degree murder, MCL 750.317; MSA 28.549, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). The Court of Appeals affirmed his conviction in an unpublished per curiam opinion.

On April 3, 1991, the defendant met the deceased, Douglas Lineberry, in the bar of a Chi-Chi's restaurant in Dearborn. They conversed, and defendant became heavily intoxicated. The defendant, a regular at that bar, left with Mr. Lineberry. Later that evening, defendant called Gary Edwards, a friend of his, in Florida. Mr. Edwards testified that defendant sounded intoxicated and wanted him to play the flute over the speaker phone. Mr. Edwards testified that he heard another person in the background, who was laughing and "partying" and whom defendant stated he met at the bar. The next day, Mr. Edwards received another call from defendant asking him to recommend a good criminal attorney. When Mr. Edwards inquired regarding why, the defendant indicated that someone was shot and there was some kind of fatality. When Mr. Edwards called him back with the name of an attorney, defendant stated, "I guess I will see you in ten years."

The victim's wife reported him missing, and a Chi-Chi's manager noticed a car in the parking lot for several days, which belonged to the victim. The victim's body was discovered in a wooded area near Brighton with a single gunshot wound to the forehead. It was a 9 mm shell, shot from about four inches. The medical

examiner testified that the deceased had been dead for approximately three to four days before the discovery of the body. In addition to the gunshot wound, there were abrasions on the sides of the neck and on the back of the hand of the deceased, and dried blood was found under his fingernails, which matched neither the deceased nor defendant. In the pocket of the deceased's clothing was a Chi-Chi's matchbook with defendant's name and telephone number written on it.

A police sergeant called the number in the matchbook and left a message on an answering machine. When the defendant called back, the sergeant asked him if he knew Mr. Lineberry, to which defendant responded that he had not heard of him. The sergeant requested that the defendant come in for an interview; however, he did not.

On April 12, the police executed a search warrant at defendant's home in Dearborn Heights. Defendant and his brother, Gregory Gearns, were present, and one officer testified that defendant was on his hands and knees scrubbing the kitchen floor when he entered the home. One of the evidence technicians sprayed luminol on various areas of the home. She testified that it would glow in the dark when exposed to certain substances, including blood and a chlorine substance present in some household cleaners and certain metals. The test produced a glow on a puddle near defendant's car in the garage and the pattern of a set of footprints in the corner of the basement. There also was a trace of denim material found in the trunk of the defendant's car, but a positive match could not be obtained with the blue jeans worn by the victim.

There was also positive presence of human blood on a trace of carpet, but it could not be typed.

The officers found 9 mm ammunition, the same caliber as the bullet that killed the deceased. Defendant was the registered owner of a 9 mm Smith & Wesson pistol, which was not found in the search. Some type O blood was found in the trunk, consistent with defendant's blood type, and type A blood was found in the trunk, but no type B blood (the victim's blood type) was found. Defendant's father testified that defendant and Gregory Gearns lived together at the Dearborn Heights address.

After the jury was sworn, the prosecutor asked for a ruling from the court outside the jury's presence. The prosecutor wanted to call Gregory Gearns as its first witness. Gregory Gearns' attorney indicated that he would assert the Fifth Amendment and refuse to answer questions. The prosecutor had offered Gregory Gearns immunity from prosecution for a charge of accessory after the fact to murder, which the prosecution argued was sufficient to cover any information that the prosecutor knew or was likely to ever know concerning Gregory Gearns' involvement. The judge indicated that she would hold Gregory Gearns in contempt if he refused to testify. His attorney indicated that he could not be held in contempt unless he actually refused to testify, and counsel for Gregory Gearns requested that the refusal take place outside the jury's presence. The prosecutor indicated his acquiescence, but the judge expressed her opinion that the refusal had to occur in front of the jury; otherwise, Gregory Gearns would not be in contempt of court.

The jury was called in, and Gregory Gearns testified about the address at which he resided. When asked with whom he lived at that address, he stated that he was taking the Fifth Amendment. On request of the prosecutor, the judge instructed the witness that he had no valid privilege and must answer the question. Counsel for Gregory Gearns indicated that he believed the privilege was valid. The prosecutor asked the court to hold Gregory Gearns in contempt. Counsel for Gregory Gearns asked that the case be dismissed. The jury was excused. Defense counsel argued it was impossible that the prosecutor could have believed that Gregory Gearns was going to testify. The judge denied the motion because Gregory Gearns did not say anything detrimental about his client, and defense counsel was not counsel for Gregory Gearns, who did not say anything about defendant.

### B. *PEOPLE v THOMAS*

Defendant Donnell Thomas was tried by a jury and convicted of voluntary manslaughter, MCL 750.321; MSA 28.553 (he was charged with second-degree murder), possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2), and carrying a concealed weapon,. MCL 750.227; MSA 28.424. The Court of Appeals reversed his conviction in an unpublished per curiam opinion. These charges arose from a shooting that occurred as several men were leaving a party on Park Street in Saginaw. The prosecutor's theory was that Thomas shot and killed his friend, Curtis Madison, while trying to shoot members of a rival gang.

Thomas and five other friends, Curtis Madison, Tarkeus Gee, Robert Jamerson, Demarcus Wesby, and

Terry King left the party around 9:30 P.M. with two others. A pickup truck heading north on Park Street drove by, and the occupants fired shots at the group. Mr. Madison and Mr. King were already in Mr. Madison's car. Mr. Jamerson and defendant returned gunfire—Mr. Jamerson from a .38 caliber revolver and defendant from a 9 mm semiautomatic pistol. Defendant and Mr. Jamerson left before the police arrived.

A 9 mm bullet was recovered from Mr. Madison, the victim. Its entry indicated it did not come from the road where the truck occupants fired shots. The expert's laser trajectory indicated defendant was in a position consistent with the line of fire, although it could also have come from a building. The 9 mm pistol was not recovered. Mr. King indicated that defendant was firing at the blue truck in their direction. Defendant offered a statement indicating that Mr. Wesby also fired shots. There was additional testimony that shots might have been fired from a nearby building. Thomas' theory was that the prosecutor failed to prove that he was the killer beyond a reasonable doubt and that, even if the jury believed he fired the shot, it was not murder.

The prosecutor and the police went to interview Mr. Gee in jail before trial, and Mr. Gee indicated that he had no intention of testifying. Mr. Gee also said there was nothing anyone could do to make him testify. The prosecutor requested that the court compel him to take the stand. The court asked Mr. Gee why he was refusing—if he was going to assert the Fifth Amendment privilege. The prosecutor agreed to grant immunity. The prosecutor and the court agreed that if Mr. Gee still refused to testify, the prosecutor would have the right to call him. The defense maintained

that to call him would be unfairly prejudicial to defendant.

Mr. Gee took the stand and stated that he did not want to testify, but did not give a reason. The trial court asked if he was refusing to testify because of the Fifth Amendment. Mr. Gee responded, "Yeah, I'm refusing on the Fifth Amendment. Is it more simple that way?" The trial court ruled that Mr. Gee had no Fifth Amendment privilege. Defendant's attorney objected that Mr. Gee had not been properly informed of the scope of his Fifth Amendment rights. The trial court then informed him that "the only person who has a legal right not to testify and to invoke the Fifth Amendment is an individual who believes that he or she may implicate themselves, maybe testify against their own penal interests." Mr. Gee indicated that he just did not want to testify, and the prosecutor's threats to add to his charges and give him a longer sentence did not bother him. He also stated that he had done nothing wrong and, thus, could not implicate himself.

Defense counsel argued that it was not permissible to place Mr. Gee on the stand in front of the jury to elicit a refusal to testify, even if the privilege asserted was invalid. The court permitted it over objection, stating that the witness' refusal would be placed on the record before the jury. Mr. Gee would not even testify with regard to his name, stating, "I'm making sure—I want—I'm refusing to say anything until I get a legal representative." He was subsequently held in contempt. Following his statement on the stand, Mr. Gee was provided with counsel, who concluded that Mr. Gee had no legal right not to testify.

III

The first issue we are called upon to decide is whether either defendant's right to confront a witness against him was implicated by permitting a witness to assert his Fifth Amendment privilege against self-incrimination in the presence of the jury. While our decision in *People v Giacalone*, 399 Mich 642, 646; 250 NW2d 492 (1977), was based on evidentiary error, we recognized that a number of other decisions were based on the Confrontation Clause. We declined to reach the constitutional issue in that case, but find it necessary and prudent to do so today. We conclude that neither defendant was denied the right of confrontation or the right to a fair trial in violation of due process.

We first address the alleged violations of the Confrontation Clause. Three United States Supreme Court decisions form the backdrop against which we determine this issue. The first is *Namet v United States*, 373 US 179, 185; 83 S Ct 1151; 10 L Ed 2d 278 (1963), in which the Supreme Court held that the petitioner's claim was evidentiary trial error, specifically noting that no constitutional issue was being decided. While we are not bound by this Supreme Court decision, it proves instructive in determining at what point this type of error becomes constitutional in magnitude.

In *Namet*, two coconspirators testified against the defendant and invoked the Fifth Amendment during portions of their testimony. The Supreme Court examined several lower court decisions regarding this type of error, in which those courts reviewed surrounding circumstances of each case, focusing primarily on two factors, each of which suggested a "dis-

tinct ground of error." *Id.* at 186. The first theory[1] rests on the conclusion that in the circumstances of a particular case, "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Id.* at 187.

Both witnesses possessed nonprivileged information that could be used to corroborate the government's case, which the government had the right to put before the jury. *Id.* at 188. The few invocations of the privilege were not significant enough to be error in the absence of prosecutorial misconduct and were merely cumulative support for inferences already established by the nonprivileged portion of the witness' testimony. *Id.* at 189. This case is factually different from the two cases we are examining here today and only serves to illustrate when no constitutional error exists.

The second decision, *Douglas v Alabama*, 380 US 415; 85 S Ct 1074; 13 L Ed 2d 934 (1965), is not inconsistent with *Namet*, but does rest on constitutional grounds. *Douglas* illustrates when the first ground for error discussed in *Namet*, critical weight, becomes constitutional in nature. In *Douglas*, the trial judge ruled that the witness could not rely on the privilege against self-incrimination to support his refusal to testify because he had been convicted.[2] He was ordered

---

[1] The second is "based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Id.* at 186. This ground of error will be addressed below.

[2] We note that while *Namet* implied that a valid privilege is required for an evidentiary error, the *Douglas* Court found it unnecessary to decide whether the witness properly invoked the privilege. It was sufficient in order to determine the Confrontation Clause claim that no suggestion was

to answer, but persisted in his refusal. The prosecutor produced a document purported to be the witness' confession and read from the document, asking the witness every few lines whether he had made that statement, until the entire document was read to the jury. *Id.* at 416-417.

The Supreme Court held that, in the circumstances of that case, the petitioner's inability to cross-examine the witness about the alleged confession denied him the right of cross-examination secured by the Confrontation Clause. The statements read by the prosecutor formed a "crucial link" in the proof against petitioner and were the "equivalent . . . of testimony" that the witness made the statements. *Id.* at 419. Effective confrontation of the witness was possible *only if* the witness affirmed the purported confession as his. He did not and, instead, relied on his privilege to refuse to answer. *Id.* at 420. The Court held that this was not a "mere minor lapse" like *Namet,* and that the statements were a fundamental part of the government's case against the petitioner. The circumstances were such that inferences from the refusal to answer added "critical weight" to the prosecution's case in a form not subject to cross-examination, thus unfairly prejudicing the petitioner. *Id.* at 420.

A third Supreme Court decision, *Frazier v Cupp,* 394 US 731; 89 S Ct 1420; 22 L Ed 2d 684 (1969), further explores the ground of error articulated in *Namet* that was utilized in the Confrontation Clause analysis of *Douglas.* The petitioner argued that the

_____

made that the witness' refusal to answer was procured by the defendant. *Id.* at 420. Thus, the validity of the privilege is not a prerequisite to the finding of a Confrontation Clause violation.

prosecutor made remarks in his opening statement that prejudiced him. The petitioner had been indicted jointly with his cousin, who pleaded guilty of the same offense. The petitioner's defense counsel told the prosecutor that the cousin would invoke his Fifth Amendment privilege if called to the stand and warned the prosecutor not to rely on his testimony in his opening statement. The prosecutor independently investigated the matter and believed, on the basis of questioning the cousin's probation officer, a police officer who had spoken with the cousin, and some relatives that the cousin indeed would testify. *Id.* at 733.

Because of that investigation, the prosecutor included a summary of the cousin's expected testimony in his opening statement. When called to the stand, the cousin indicated that he would assert his privilege against self-incrimination regarding any question related to activities in question. The matter was not further pursued and he was dismissed from the stand. *Id.* at 734. The petitioner argued that the substance of his cousin's statement was placed before the jury as the equivalent of testimony not subject to cross-examination and added substantial weight to the prosecution's case. *Id.* at 734.

The Supreme Court considered whether the petitioner was denied his confrontation rights as guaranteed by the Sixth and Fourteenth Amendments.[3] Although the "question . . . posed [was] not an easy one," the Supreme Court disagreed with the peti-

---

[3] The Supreme Court did hold, in *Frazier*, that a prosecutor's good faith, or lack of it, is not controlling in determining whether a defendant has been deprived of the right of confrontation guaranteed by the Sixth and Fourteenth Amendments. *Id.* at 736.

tioner. *Id.* at 734-735. Unlike *Douglas*, the witness was on the stand for a short period, only a paraphrase of the statement was put in front of the jury, and it was not done while the witness was on the stand. Moreover, the statement was not vitally important to the prosecution's case. Under these circumstances, the instruction to the jury that counsel's statements were not evidence was sufficient to protect the petitioner's constitutional rights. *Id.* at 735. The crux of *Frazier* is that an inference was not likely to be drawn because of the separation of the opening statement, which only paraphrased the expected testimony, from the questioning of the witness.[4]

The instant cases are unlike *Douglas*, where a purported confession of a codefendant was placed before the jury through the prosecutor's questions, to each of which the witness asserted the Fifth Amendment privilege.[5] No statements or other evidence was presented to the jury that was the "equivalent . . . of testimony." In *Namet*, the witnesses offered much other substantive testimony apart from their assertions of the Fifth Amendment to a few questions. The defendant was able to cross-examine the witnesses about the substance of the testimony that was actually put before the jury. Here, there was no substance on which the defendants could cross-examine the witnesses.

In *Frazier*, substantive proposed testimony was put before the jury in the prosecutor's opening statement.

---

[4] *Frazier* left open the issue whether, under different circumstances, such an instruction would still be sufficient to protect a defendant's constitutional rights.

[5] The confession was inadmissible under that state's rules of evidence. *Id.* at 418.

However, because of the separation of the opening statement from the witness' refusal to testify on the stand, the fact that the proposed testimony was not critical, and because of the general limiting instruction,[6] this was held not to be constitutional error.

The present cases are most like *Frazier*. In fact, they are far less close to constitutional error than the facts in *Frazier*. No substantive testimony was placed before the jury. In particular, we note the absence of any claim in *Frazier* that merely placing the witness on the stand and having the witness assert Fifth Amendment rights was, by itself, constitutional error. The Supreme Court found no constitutional error in circumstances similar to the present circumstances, even with the additional aggravating factor of putting proposed substantive testimony before the jury in an opening statement.

We would hold that in both *Gearns* and *Thomas* no Confrontation Clause violation occurred. A defendant has the constitutional right to confront witnesses against him, primarily secured by the right to cross-examination. See *Douglas*, *supra* at 418. In the instant cases, there was no testimony given by the witnesses on which the defendants could have cross-examined them. In *Gearns*, the witness was asked one question, to which he responded by asserting his Fifth Amendment privilege. That he lived with his brother was subsequently established by the prosecution, and, thus, this only supported a fact already established by other testimony. See *Namet*, *supra*. The prosecution subsequently asked Gregory Gearns if he had been

---

[6] Because we find no confrontation violation, whether a general or specific limiting instruction would have cured this type of constitutional error need not be addressed.

granted immunity, to which he responded affirmatively. In *Thomas*, the witness was also asked one question, to which he articulated his refusal to testify and his desire for a "legal representative." In neither case was any substantive evidence, in the form of testimony or its equivalent, placed before the jury.

Our position is supported by the general Confrontation Clause jurisprudence of the United States Supreme Court. First, the principal protection provided by the Confrontation Clause to a criminal defendant is the right to conduct cross-examination. *Pennsylvania v Ritchie*, 480 US 39, 51; 107 S Ct 989; 94 L Ed 2d 40 (1987); *Delaware v Fensterer*, 474 US 15, 18-19; 106 S Ct 292; 88 L Ed 2d 15 (1985). Moreover, the Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Fensterer, supra* at 20; *Ritchie, supra* at 53; *People v Bushard*, 444 Mich 384, 391; 508 NW2d 745 (1993) (emphasis in original). Finally,

> [t]he Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. *To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.* [*Fensterer, supra* at 21-22; *United States v Owens*, 484 US 554, 558; 108 S Ct 838; 98 L Ed 2d 951 (1988) (emphasis added).]

Implicit in the Supreme Court's Confrontation Clause jurisprudence is that a witness must put forth

*some testimony* before the defendant's right of confrontation comes into play. A defendant has no right to confront a witness who does not provide any evidence at trial. *People v Scheidt,* 182 Colo 374, 384; 513 P2d 446 (1973), citing *United States ex rel Meadows v New York,* 426 F2d 1176 (CA 2, 1970). A mere inference is simply insufficient for a Confrontation Clause violation.

The core of the *Douglas* decision was that the "equivalent . . . of testimony" was placed before the jury. While the "critical weight" theory is articulated in terms of "inferences," we must emphasize that it also requires these inferences to be a form "not subject to cross-examination." A defendant is only guaranteed an opportunity for cross-examination; however, there must first be something of substance to cross-examine. We agree with the Colorado Supreme Court that, where a witness does not testify about matters beyond preliminary information, i.e., matters that have no bearing on the outcome of the case, there is nothing for the defendant to cross-examine, and the policies underlying this constitutional right do not come into play. *Scheidt, supra* at 384. Thus, before a defendant can be denied effective cross-examination, some substantive testimony or its equivalent must come to pass in order for the right to confrontation to arise.

We now turn to the second possible ground for constitutional error articulated in *Namet,*[7] which implicates due process. The second theory is based on a concept of prosecutorial misconduct, where the

---

[7] Again, we emphasize that the Court in *Namet* specifically declined to address any constitutional issue, and the holdings therein were based on an evidentiary error analysis.

government makes a "conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Id.* at 186. The *Namet* Court found significant that the first witness invoked the privilege with regard to one question and the other only with regard to four questions. These few lapses, viewed in the context of the entire trial, did not amount to a deliberate attempt by the government to "make capital" out of the refusals to testify. *Id.* at 189. Thus, prosecutorial misconduct as a ground for evidentiary error was not satisfied.[8]

The Supreme Court has not definitively addressed whether prosecutorial misconduct can violate a defendant's constitutional rights in this context. However, the "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v Phillips*, 455 US 209, 219; 102 S Ct 940; 71 L Ed 2d 78 (1982). This Court has also repeatedly articulated the principle that, in reviewing claims of prosecutorial misconduct, it must be determined whether the conduct rose to such a level as to deny

---

[8] We note some overlapping in the Confrontation Clause and prosecutorial misconduct analyses. While the two grounds articulated in *Namet* present "distinct grounds of error," often it is difficult to distinguish, factually, between a "conscious and flagrant attempt to build a case out of inferences arising from use of the testimonial privilege" and where such assertions of the privilege add "critical weight" to the prosecution's case. It is important to note a critical difference in the analysis of the two issues. The focus of the prejudice inquiry in determining whether a defendant's confrontation right has been violated must be on the particular witness, *not on the outcome of the entire trial. Delaware v Van Arsdall*, 475 US 673, 680; 106 S Ct 1431; 89 L Ed 2d 674 (1986). This type of error is then subject to the harmless error analysis. *Id.* at 684. In contrast, the focus of any prosecutorial misconduct claim is the *fairness of the entire trial*; in other words, the outcome of the trial is the focus. See *Smith v Phillips*, 455 US 209; 102 S Ct 940; 71 L Ed 2d 78 (1982).

the defendant a fair trial. *People v Bahoda*, 448 Mich 261, 267; 531 NW2d 659 (1995), *People v Allen*, 351 Mich 535; 88 NW2d 433 (1958), and *People v Hammond*, 394 Mich 627; 232 NW2d 174 (1975). Thus, the "Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v Van Arsdall*, 475 US 673, 681; 106 S Ct 1431; 89 L Ed 2d 674 (1986); *People v Reed*, 449 Mich 375; 535 NW2d 496 (1995).

The Supreme Court declined to address this issue in *Frazier*,[9] but did not rule out that prosecutorial misconduct in this context can result in a constitutional violation. The prosecutorial misconduct in this situation, thus, should be analyzed just as any claim of alleged prosecutorial misconduct. Utilizing the Supreme Court's due process analysis for prosecutorial misconduct, the issue then becomes whether the conduct rose to such a level as to deny the defendant a fair trial in violation of due process. The Supreme Court held that the proper inquiry is not the fact of the prosecutor's misconduct, but, rather, its effect on the trial. *Smith, supra* at 220. Thus, prosecutorial misconduct alone does not require a new trial. *Id.*

We also find it helpful to turn to cases from our sister states, which have grappled with the issue of prosecutorial misconduct in this context. The Arizona Supreme Court decided whether a defendant was denied the right to due process and a fair trial in

---

[9] Because it agreed that the state reasonably could have expected the witness to testify in accordance with previous statements, it found no need to decide whether the type of prosecutorial misconduct alleged to have occurred in *Frazier* would have been sufficient to constitute constitutional error requiring reversal. *Frazier, supra* at 737.

*State v Corrales*, 138 Ariz 583; 676 P2d 615 (1983).[10] First, the court held that merely calling a witness to the stand and procuring his invocation of the privilege is not a violation of either prong of the *Namet* rule. *Id.* at 589. However, after the witness' assertion of Fifth Amendment rights, at which time the prosecutor had determined that the witness would do so despite the court's ruling that it was not available, the proper procedure would have been to so instruct the witness and determine whether he would obey the instructions. *Id.* If the prosecutor found that the witness would follow his attorney's instructions and refuse to testify, rather than the court order, then the witness could be withdrawn and "no serious harm would have occurred." *Id.*

However, in *Corrales*, the prosecutor continued questioning the witness and asked leading questions that connected the defendant to the witness in the commission of the crime. *Id.* at 590. Moreover,

> [t]he fact that it was permissible to call [the witness] to ascertain whether he would take the fifth amendment did not make it permissible to continue asking him questions after it had become apparent that he would take that privilege. The law is quite to the contrary. Prosecutorial insistence in asking prejudicial questions depicting a defendant's involvement in the crime after it becomes clear that the witness-alleged accomplice has refused and will continue to refuse to testify is an attempt to build the prosecutor's case out of inferences arising from use of the testimonial privilege and is misconduct. [*Id.* at 591 (citations omitted).]

---

[10] The court found that both prongs of *Namet* were violated and found both a due process/fair trial violation because of prosecutorial misconduct and a Confrontation Clause violation. *Corrales, supra* at 590 and 595.

The instant cases stand in stark contrast to *Corrales.* We have no "[p]rosecutorial insistence in asking prejudicial questions depicting a defendant's involvement in the crime . . . ." Once the initial assertions of the privilege occurred, both prosecutors ceased questioning the witnesses. Gregory Gearns was asked if he had been granted immunity; however, that still did not depict defendant's involvement in the crime. Thus, the prosecutors in these cases did not attempt to build their cases on inferences drawn from a witness' assertion of the testimonial privilege.

In deciding that no prosecutorial misconduct occurred, the Massachusetts Supreme Judicial Court found that because the prosecutor only questioned the witness[11] once, included no "facts" in the form of leading questions, and made no comment about the witness' recalcitrance in his closing argument, there was no showing that the prosecution consciously sought to build its case out of inferences arising from the witness' silence. *Commonwealth v Kane,* 388 Mass 128, 138; 445 NE2d 598 (1983). The present cases fall within the requirements of *Kane.* While in *Gearns,* the prosecution's mention of the grant of immunity was probably not the most prudent course of action, it still does not rise to the level of building its entire case from inferences arising from the refusal to testify.

The Delaware Supreme Court found neither a due process nor a Confrontation Clause violation where the witness waived his Fifth Amendment right, the state was entitled to call the witness because his pre-

---

[11] This case involved the priest-penitent privilege, not the privilege against self-incrimination. However, the court used the *Namet* analysis.

vious testimony implicated the defendant, the record did not establish that the witness would refuse to give any testimony, the witness answered preliminary questions before asserting Fifth Amendment rights, and the state's questioning of the witness that prompted the refusal was directed solely at the witness' role in the crime, not the defendant's. *McBride v State*, 477 A2d 174, 186 (Del, 1984).

In the instant cases, the only factor arguably satisfied is that it was well established that the witnesses would refuse to testify. However, this is simply not enough to constitute a due process violation, denying either defendant a fair trial. This is so in light of the Supreme Court's admonition that prosecutorial misconduct alone is insufficient for the grant of a new trial (see *Smith, supra*) and that merely calling a witness to the stand, even knowing that he will assert Fifth Amendment rights, does not rise to the level of *constitutional* violation. See *Corrales, supra.*

This analysis is supported by the Wisconsin Supreme Court, which made an important distinction between cases finding prejudicial error and those that did not by holding that the controlling factor was *not* that prosecution called the witness to the stand, but rather that it put questions to the witness, which if not answered, would lead to the inference that the answers, if given, would be unfavorable to the defendant. *Price v State*, 37 Wis 2d 117, 125; 154 NW2d 222 (1967).[12] Thus, calling a witness to the stand, even if the prosecutor knows that the witness will assert Fifth Amendment rights, does not, by

---

[12] While this court was deciding a Confrontation Clause claim, we also find this distinction important in the due process analysis.

itself, deny a defendant a fair trial or due process of law. *Namet* and its constitutional progeny require far more to establish a conscious and flagrant attempt to build a prosecution case from inferences arising from assertions of testimonial privilege.

IV

Because we have concluded that no constitutional error occurred in these cases, we must now determine whether evidentiary error occurred. We conclude that in both cases evidentiary error did occur. This Court's decision in *Giacalone, supra,* forms the foundation of this evidentiary error analysis. In *Giacalone,* the defendant and two others were charged with armed robbery. One, Jolly, was tried separately and convicted. Jolly's attorney advised the judge and other counsel that Jolly would assert his Fifth Amendment privilege and refuse to testify. The prosecution called him to the stand and asked two questions, to which he responded by asserting his Fifth Amendment privilege. *Id.* at 644. This Court held on the basis of an ethical rule of conduct[13] that an attorney may not call a witness knowing that he will claim a valid privilege not to testify. We recognized that when an

> "alleged accomplice invokes the privilege in the presence of the jury, prejudice arises from the human tendency to treat the claim of privilege as a confession of crime, creating an adverse inference which an accused is powerless to combat by cross-examination." [*Id.* at 645, quoting *State v Allen,* 224 NW2d 237, 241 (Iowa, 1974).]

---

[13] "A lawyer may not knowingly offer inadmissible evidence or call a witness knowing that he will claim a valid privilege not to testify." *Giacalone* at 645, citing the ABA Project on Standards for Criminal Justice.

We again addressed this issue in *People v Dyer*, 425 Mich 572; 390 NW2d 645 (1986), in which the defendant wanted to put a witness on the stand solely to have him assert his Fifth Amendment privilege in front of the jury in order to support his defense that someone else (the witness) committed the crime. This Court, in reversing the Court of Appeals, explained that the *Giacalone* rule applied to the defense as well as the prosecution. *Id.* at 581. The witness in *Dyer* was neither an accomplice nor a codefendant. *Id.* at 578. However, this Court agreed that answering any questions regarding the evening of the defendant's arrest or the witness' presence at the scene of the crime might have tended to incriminate the witness. *Id.* at 579.

The prosecution in *Thomas* takes issue with the Court of Appeals holding that "inherent prejudice" results when an individual who is connected to the criminal episode or to the defendant invokes his Fifth Amendment privilege in front of the jury. The prosecution also contends that Court of Appeals decisions have eroded this Court's requirement that a valid privilege be asserted. While the prosecution agrees that invalid assertions of privilege may be as prejudicial as valid assertions, it does not follow that the validity of the privilege has no bearing at all. The invalidity creates a real possibility that the witness may have a change of mind; it is relevant to the prosecutor's good faith.

Defendant Thomas responds by explaining that Mr. Gee repeatedly refused to testify and neither immunity nor contempt changed his mind. There is no indication that the prosecutor thought Mr. Gee would change his mind and testify, nor was there any evi-

dence to suggest that he would. If the prosecutor needs to explain the absence of a witness, that should be cured by an instruction, not by putting the witness on the stand to refuse to testify.

The prosecution in *Gearns* maintains that it was not certain that Gregory Gearns would assert his Fifth Amendment rights because he had been advised by his attorney that he must testify and because of his attorney's assertion that he could not be held in contempt until he was called to the stand and asserted Fifth Amendment rights before the jury.[14]

The people are correct that *Giacalone* and *Dyer* speak in terms of a valid privilege, although this was not directly at issue in either case. The Court of Appeals has expanded on *Giacalone*, and the prosecutors in these cases urge this Court to reverse that trend. In *People v Poma*, 96 Mich App 726, 731; 294 NW2d 221 (1980), the Court of Appeals held that the validity of a witness' privilege has no bearing on the prejudice to the defendant that results when an "intimately connected" witness asserts Fifth Amendment rights on the stand. The Court of Appeals also outlined certain procedures that must be followed:

> The court should first hold a hearing outside the jury's presence to determine if the intimate witness has a legitimate privilege . . . . This determination should be prefaced by an adequate explanation of the self-incrimination privilege so the witness can make a knowledgeable choice regarding assertion. . . .
>
> If the court concludes that the witness has no legitimate privilege, it should consider contempt penalties or other alternate remedies against the witness. Yet, with respect to

---

[14] Jeffrey Gearns' attorney specifically requested that this procedure take place outside the presence of the jury.

the defendant, the court must proceed to determine if the witness intends to assert that privilege, whether validly or invalidly, at trial. If the intimate witness intends to claim the protection of the Fifth Amendment at trial, there really is no way to prevent prejudice to the defendant absent barring that witness.

\*     \*     \*

We hold that it is inherently prejudicial to place a witness on the stand who is intimately related to the criminal episode at issue, when the judge and prosecutor know that he will assert the Fifth Amendment privilege. When a judge determines at the evidentiary hearing that the intimate witness will either properly or improperly claim the protection against self-incrimination, he must not allow this witness to be called to the stand. [*Id.* at 732-733 (citations omitted).]

On the basis of our precedent, we must first determine how the witness' status as an "intimate witness" affects the inquiry. Next, we must determine whether the validity of the privilege is controlling in this analysis. Third, we will discuss the procedures outlined by the Court of Appeals in *Poma*. Finally, we will address whether any limiting instructions are necessary in these cases.

*Dyer* and *Giacalone* stand for the proposition that it is an ethical violation for an attorney to put a witness on the stand knowing that the witness will validly assert the Fifth Amendment. However, where the possible prejudice comes into play is when the witness is an accomplice or codefendant or, as in *Dyer*, is intimately connected to the crime, although neither as an accomplice nor as a codefendant. Obviously, for there even to be *possible* prejudice to the defendant, the witness must be substantially related to the criminal episode at issue.

While the requirement of a witness' status as an "intimate witness" is not usually a contested issue, the Pennsylvania Supreme Court clearly articulated this requirement when it held that

> the prosecution, once informed that a witness intends to claim a privilege against self-incrimination, commits error in calling that witness to the stand before the jury where the witness is a person (co-defendant, accomplice, associate, etc.) likely to be thought by the jury to be associated with the defendant in the incident or transaction out of which the criminal charges arose. [*Commonwealth v DuVal*, 453 Pa 205, 217; 307 A2d 229 (1973).]

The people in both cases argue that the witnesses were not accomplices. However, the witness in *Dyer* was neither an accomplice nor a codefendant, but was simply present at the scene of the crime. Mr. Gee was also present at the scene of the crime in circumstances similar to those presented in *Dyer*. Gregory Gearns was obviously intimately involved in the criminal episode because he had been granted immunity as an accessory after the fact. Without this critical element, the possible prejudice to the defendant does not exist.

Next, we agree that the validity of the privilege is not necessarily controlling in this evidentiary error analysis. While this issue first became jurisprudentially significant in the context of valid assertions of testimonial privileges, the validity of the privilege does not address the central issue at hand. If the concern is the possible prejudice to the defendant, then why focus on the validity of the witness' constitutional rights? While the key difference between the constitutional error analyses above and the evidentiary error analysis is the good faith or knowledge of

the prosecutor,[15] we do not believe that the validity of the privilege as determined by the trial court is absolutely controlling in determining whether the prosecutor acted in good faith.[16]

*Giacalone* did emphasize both the validity of the privilege and that an accomplice was invoking it. However, we also noted that evidence is traditionally excluded where effective cross-examination is difficult to obtain, such as hearsay. *Id.* at 646, n 6. Under this basis for our holding, the validity of the privilege does not appear controlling. Moreover, the validity or invalidity of the privilege does not focus on the real issues: Does the prosecutor know that the witness will refuse to testify and will the defendant suffer possible prejudice? Merely because the privilege may be invalid does not negate the prosecutor's knowledge or satisfy his ethical responsibility under *Giacalone*. Moreover, the invalidity of the privilege does not rebut the possibility of prejudice to a defendant.

Other jurisdictions have decided this issue and the courts are split. The Pennsylvania Supreme Court expressed its disagreement with courts holding that the privilege must be valid:

> We disagree with those jurisdictions in which it is held that the prosecution may with impunity call before the jury

---

[15] As the Supreme Court noted in *Frazier, supra,* a prosecutor's good faith is not controlling in a confrontation analysis. Moreover, the fairness of the trial is central to a due process analysis, not the culpability of the prosecutor. See *Smith, supra.*

[16] The United States Supreme Court held, in the constitutional context, that it was unnecessary to decide if the privilege was valid because the refusal to testify was not procured by the defendant. *Douglas, supra* at 420. We note that this is also relevant in the evidentiary error analysis, and no evidence was presented in these cases that either defendant "procured" the refusal to testify.

a witness likely to be associated with the defendant in the
minds of the jurors, knowing that a privilege against self-
incrimination will be claimed and yet believing that the
claim of privilege will be legally invalid. [*DuVal, supra* at
216.]

The court noted that it was probably even more prej-
udicial to a defendant to observe a recalcitrant wit-
ness electing to remain silent, notwithstanding a
court order to testify. *Id.* at 217. Requiring the privi-
lege to be valid may seem like a simple bright-line
rule; however, it does not address that the source of
the error lies in the prosecutor *knowingly* putting a
witness on the stand who is going to assert a privi-
lege, not in whether a witness is properly exercising a
testimonial privilege.

The dissent asserts that if the trial court finds the
witness' privilege invalid, the prosecution has every
right to put the witness on the stand, expecting the
witness to comply with the obligation to testify. Thus,
contrary to our conclusion, the dissent would hold
that the ruling of the trial court does indeed negate
the prosecutor's knowledge.[17] We fail to see how a

---

[17] Moreover, does a witness really have an obligation to testify if the
trial court has erroneously determined the validity of his privilege? In this
vein, we note another difficulty with the dissent's analysis. It certainly
raises concerns about the trial judge's determination of the validity of the
privileges at issue. Thomas argues that it is far from clear that Mr. Gee
was asserting an invalid privilege. At the hearing, the court refused to
appoint counsel to explain the privilege to him. Only after being offered
immunity and being held in contempt for his refusal to testify was an
attorney appointed for him. Only at that point did the attorney conclude
that Mr. Gee did not have a valid right to assert his Fifth Amendment
rights. In *Gearns*, it does not appear that the trial court employed the
proper procedures for determining the validity of Gregory Gearns'
privilege.

First, the prospective witness must show, at the very least, that he is
faced with some authentic danger of incrimination. *United States v Cas-*

prosecutor, in good faith, can believe that a witness who is willing to face possible criminal contempt charges and confinement when questioned in the presence of the trial judge, will suddenly have a change of heart and be less willing to face those same possible charges when faced with the jury.

In *Gearns*, the witness' attorney repeatedly advised the trial court that he believed Gregory Gearns had a valid privilege and that the scope of the immunity

---

*tro*, 129 F3d 226, 229 (CA 1, 1997), citing *Hoffman v United States*, 341 US 479, 486-487; 71 S Ct 814; 95 L Ed 1118 (1951). Because the privilege cannot be invoked on a blanket basis and thus operates question by question, the trial court must conduct a particularized inquiry. *Id.* at 229. The questions need not be directly incriminating for the privilege to attach. Moreover,

> [i]f a reply to a seemingly innocuous question reasonably will tend to sculpt a rung in the ladder of evidence leading to prosecution, the privilege appropriately may be invoked. [*Id.* at 229; *Hoffman* at 486.]

The trial judge here conducted no such inquiry. It was established before trial, on the basis of information he gave the police, that Gregory Gearns had a valid privilege regarding events after the murder. He was granted immunity as an accessory after the fact. However, he was asserting his Fifth Amendment privilege regarding events occurring before that.

It was apparently legal error for the trial judge in *Gearns* to fail to conduct a particularized inquiry of Gregory Gearns' assertion of the privilege regarding events not covered by the grant of immunity. The prosecutor and the trial judge seemed to believe that this witness did not have a valid privilege because the prosecutor had no evidence of his involvement, except as an accessory after the fact. However, the validity of the privilege is not dependent on whether the authorities already have evidence against a person. The point of the privilege is to invoke the right to prevent the authorities from compelling a witness to give self-incriminating evidence.

Moreover, "it is never within the trial court's discretion to make a determination that is premised on an incorrect legal standard." *Castro* at 229. Here, the trial judge relied on an incorrect legal standard; the validity of the privilege is *not* based on whether the *prosecutor already has* any evidence that would incriminate a witness. Gregory Gearns was also later acquitted of contempt, which further evidences the real possibility that his privilege was indeed valid, contrary to the decision of the trial court.

grant was not sufficient. He indicated that his client would not testify. We fail to see how a prosecutor, in good faith, can believe that a witness will not heed the advice of his own counsel and suddenly become willing to testify merely because the jury enters the courtroom. In *Thomas*, the witness could not have made it more clear that he would not be testifying, even when faced with threats of additional prison time and after being granted immunity. The prosecutors had no reasonable expectation that these witnesses would testify. Therefore, the only reason to put such a witness on the stand was for the jury to see each witness assert his privilege. The impermissible inference is no less present when the privilege might be invalid. Moreover, the dissent would presumably permit a defendant to also place a witness on the stand whose privilege is deemed invalid by the trial court, obviously seeking the same inference we held impermissible in *Dyer*. We conclude that, in these cases, it was not reasonable for the prosecutors to believe that the witnesses would testify. Thus, the prosecutors committed the same misconduct we deemed evidentiary error in *Giacalone* and *Dyer* because they were armed with the knowledge that the witnesses would claim a privilege, in spite of the trial courts' rulings that their privileges were invalid.

Additionally, compliance with the procedures outlined in *Poma* is really quite simple—the intimate witness must be given an opportunity to testify or assert his privilege outside the jury's presence. The prosecution then has the information it needs to decide whether to request an instruction regarding the absence of the witness, *Dyer, supra,* and the defendant is not prejudiced by any possible adverse infer-

ence. This procedure protects the concerns and rights of both the people and the defendant.

Moreover, other courts have utilized procedures similar to those outlined in *Poma*. The *DuVal* court also noted what a "simple" procedure it was for the prosecutor to inform the court that a witness he intends to call will assert Fifth Amendment rights and obtain a ruling on the matter. *DuVal, supra* at 216; see also *Allen, supra* at 224 NW2d 241. Furthermore, the matter should be treated without the presence of the jury, and, if the court determines that the privilege is not valid, it should be determined outside the jury's presence whether the witness will continue to refuse to testify. If the witness does refuse, contempt of court and removal should also take place outside the jury's presence. *DuVal, supra* at 217.

Thus, the judge must hold a hearing outside the jury's presence to determine if the witness' privilege is valid, explaining the privilege to the witness. If the court concludes the privilege is not valid, it must determine whether the witness intends to proceed with asserting an invalid privilege. If the witness does so intend, then the witness may not be called. We agree that compliance with these procedures is simple indeed and protects the defendant while giving the prosecutor an important opportunity to "coax" a reluctant witness to testify.

Finally, we address the necessity of limiting instructions. We noted in *Dyer* that, where a party does not produce or call a codefendant or a witness to substantiate a claim of innocence or guilt, the jury may draw an adverse inference from the absence of this evidence. A neutralizing instruction explains to the jurors that they may not draw an inference from

the absence of certain witnesses or engage in specu-
lation about the possible nature of their testimony.
Such an instruction, while not mandatory, should be
given when requested to avoid prejudice. *Dyer, supra*
at 582-583.

It is clear that a limiting instruction should be used
to explain the absence of a witness, if necessary. A
defendant may also request an instruction that no
adverse inference should be drawn from a witness'
assertion of a testimonial privilege, should that occur
in front of the jury. However, a defendant, in particu-
lar, may not want to request such an instruction,
thereby calling attention to the witness' assertion of
the privilege, just as the prosecution may not wish to
request an instruction regarding a witness' absence
and, thus, call attention to that fact. Requesting either
instruction is in the discretion of the trial attorney
and is relevant to trial strategy. In sum, we would
reaffirm our holdings in *Giacalone* and *Dyer*. It was
error for the prosecutors in the cases at bar to call
witnesses intimately connected to the crimes at issue,
knowing those witnesses would assert their Fifth
Amendment rights, validly or invalidly.

V

A

We now turn to the third issue that we must decide.
This is the issue we recently left open in *People v
Mateo*, 453 Mich 203; 551 NW2d 891 (1996), that is,
what "level of assurance" a reviewing court must
have for preserved nonconstitutional error under *Kot-
teakos v United States*, 328 US 750; 66 S Ct 1239; 90 L
Ed 1557 (1946). We would adopt the highly probable
standard as articulated in *Mateo*. While we find that

evidentiary error occurred in both cases before us, we would hold that the people have proved that it was highly probable that, in the light of the strength and weight of the untainted evidence, the tainted evidence did not contribute to the verdicts.

The prosecution asserts that, but for the language of MCL 769.26; MSA 28.1096, that reversal cannot occur unless it shall affirmatively appear that the challenged error has resulted in a miscarriage of justice, we could define the term "miscarriage of justice" differently when different contexts are presented, such as where the error is unpreserved, by placing the burden of persuasion on the defendant, and where the error is preserved, as in *Kotteakos*, by placing the burden of persuasion on the prosecution. But, the prosecution contends that this language could only be interpreted as placing the burden of persuasion on the defendant, thus requiring the defendant to show by a preponderance of the evidence that the error during trial did have a substantial and injurious effect or influence on the jury's verdict.

The prosecution also argues that the "level of assurance" discussion in *Mateo* seems "mistaken": in the federal system the burden is on the government to demonstrate that nonconstitutional error did not have a substantial and injurious effect or influence on the jury's verdict, leading to adoption of either the preponderance of the evidence or the highly probable standards, but in Michigan, MCL 769.26; MSA 28.1096 places the burden on the defendant to overcome the presumption that the error was not prejudicial.

Both defendants advocate the highly probable standard discussed in *Mateo*. There, we left open the level of confidence the reviewing court must have in the

harmlessness of preserved error. However, this Court did note that the highly probable test may represent the appropriate test. *Id.* at 207. Furthermore,

> [s]imply stated, and employed in both federal rule and case law and state statute and court rule, reversal is only required if the error was prejudicial. That inquiry focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence. [*Id.* at 215.]

This Court seemingly approved former Chief Justice Traynor's position that the highly probable test, which assesses whether it is highly probable that the challenged evidence did not contribute to the verdict, is the most appropriate. *Id.* at 219. Justice Traynor suggested that the highly probable test strikes the appropriate balance between protecting both the public's and defendants' interests in fair trials. *Id.* at 220.

We disagree with the prosecution that MCL 769.26; MSA 28.1096 places the burden of persuasion on the defendant for preserved nonconstitutional error. This Court held in *Mateo* that the statute does not impinge on this Court's authority to determine practice and procedure, does not require a literal definition of miscarriage of justice, and is consistent with *Kotteakos*. *Mateo* at 206. Thus, now that we have received the appropriate assistance from the bench and bar that was lacking in *Mateo*, we adopt the highly probable standard.

B

We must now decide whether the people in these cases have proved that it was highly probable that the errors did not contribute to the verdicts. Defendant

Thomas argues that Mr. Gee's silence did invite improper inferences and, thus, that the prosecution has not proved that it was highly probable that the error did not contribute to the verdict. The prosecution's theory of the case related to a "gang war" of sorts. Mr. Gee's silence implicated defendant by permitting the inference that gang members are honor-bound not to turn against one another. Mr. Gee's adherence to the code of silence strongly suggested the defendant's guilt.

Defendant Gearns also argues that the prosecution did not prove that it is highly probable that the error did not contribute to the verdict because, while the question asked of Gregory Gearns might appear innocuous, the significance of the address was not innocuous in the circumstances of this case. The prosecution was careful to develop the fact that Gregory Gearns lived with defendant from other witnesses and that the address was the last place the deceased was seen or heard alive. The prosecution further made a tremendous effort to establish the residence as the scene of the shooting. It also established Gregory Gearns' presence during the execution of the search warrant. Furthermore, it exploited the error by asking twice, over defense objection, whether Gregory Gearns had been served with an order of immunity.

Circumstantial evidence primarily comprised the cases against both defendants. However, not only was the circumstantial evidence, as a whole, strong, the physical evidence connecting defendant Gearns to the crime was substantial. We find the error to be harmless in the light of the strength and weight of the untainted evidence. In *Thomas*, the evidence was also

circumstantial; however, strong evidence was presented placing defendant Thomas at the scene of the crime and establishing him as the shooter. Moreover, Mr. Gee asserted that he did not do anything wrong, thus negating somewhat any adverse inference that resulted from his refusal to testify. We also find this error to be harmless in the light of the strength and weight of the untainted evidence. In both *Gearns* and *Thomas*, we would hold that the people have proved that it was highly probable that the tainted evidence did not contribute to the verdicts. Thus, neither defendant was unfairly prejudiced by the evidentiary error that occurred at trial.

VI

In both cases before us, we hold that no constitutional error occurred and that, while evidentiary error did occur in both cases, it is highly probable that the errors did not contribute to the verdicts in the light of the strength and weight of the untainted evidence. We, therefore, would affirm the Court of Appeals decision in *People v Gearns* and would reverse the Court of Appeals decision in *People v Thomas*.

MALLETT, C.J., concurred with BRICKLEY, J.

CAVANAGH, J. (*concurring in part and dissenting in part*). While I agree with Justice BRICKLEY's finding of evidentiary error in these cases, and the utilization of the "highly probable" test to determine that error's harmlessness, I disagree with the application of that test to the facts of these cases. I find that Justice BRICKLEY's opinion has not adequately considered the facts in relation to the inferences that were erroneously placed before the jury. I believe that, when the

weight of these inferences is fully considered, it cannot be said to be highly probable that the tainted evidence did not contribute to the verdicts and, hence, that reversal is required. I, therefore, concur in parts II, IV, and in a portion of part V of Justice BRICKLEY's opinion, but dissent from part I and a portion of part V. My conclusion in this matter gives me no cause to reach the constitutional issue raised in part III, and, hence, I express no view with respect to the matters addressed by Justice BRICKLEY in part III of his opinion.

I

In examining this case, I look first to possible evidentiary error, because such a finding, warranting relief, would preclude the need for constitutional review. *People v Giacalone*, 399 Mich 642, 645-646, n 6; 250 NW2d 492 (1977). I concur with part IV of Justice BRICKLEY's opinion that in both cases evidentiary error occurred for the reasons stated therein.[1] I

---

[1] I note as well that I agree with Justice BRICKLEY that the validity or invalidity of the privilege asserted has no effect on analyzing the error resulting from its assertion before the jury. Nothing in our past decisions indicates that we considered the validity of the privilege to be crucial to the determination, and, furthermore, to do so would turn the focus away from the assertion of the privilege before the jury, which is the source of error, and toward an irrelevant determination that has absolutely no bearing on the inferences drawn by the jury.

Furthermore, given that the witness in *Gearns* was represented by counsel who steadfastly maintained that the witness had a valid privilege (and also noting the witness' later acquittal on contempt charges arising from his refusal to testify), I believe the privilege in *Gearns* was in fact valid, and the trial court likely erred in determining otherwise. As we noted in *People v Dyer*, 425 Mich 572, 579; 390 NW2d 645 (1986), "a trial court may compel a witness to answer a question only where the court can foresee, as a matter of law, that such testimony could not incriminate the witness." In view of the position taken by the witness' counsel, who alone had access to the witness' account of his true role in this crime, I find that the trial court could not have properly met this standard, and,

further concur with the utilization of the "highly prob-
able" test, again for the reasons cited by Justice
BRICKLEY. It is in the application of this test to the
instant facts that I part company.

II

A. *GEARNS*

Defendant Gearns was convicted of second-degree
murder.[2] An analysis of the facts offered into evi-
dence indicates that the prosecution's case was pri-
marily circumstantial. While there was ample circum-
stantial evidence tying the defendant to the victim,
there was no evidence offered regarding how the vic-
tim came to be shot to death. Indeed, it seems that
even a coherent prosecution theory of the crime was
lacking. The evidence tended to show that the defend-
ant and the victim became acquainted at a bar, that
they left the bar together, that the victim died at the
defendant's house, and that the defendant did not
recall the events.[3]

---

therefore, erred in ruling the privilege invalid. While the issue in *Thomas*
is closer, given that the trial court did not appoint counsel and seek coun-
sel's assessment of the validity of the privilege until *after* immunity was
granted to the witness, I do not find sufficient facts to exist to determine
that the privilege initially was invalid there either, although the point did
become moot once the prosecutor and the court agreed to a grant of
immunity.

Lastly, when the United States Supreme Court was called on to con-
sider this sort of error within a constitutional framework, it did not find it
necessary to determine whether the claimed privilege was valid. *Douglas
v Alabama*, 380 US 415, 420; 85 S Ct 1074; 13 L Ed 2d 934 (1965). While an
evidentiary analysis theoretically could lead to a different conclusion, I
see no reason why it should. For all these reasons, any focus on the valid-
ity of the privileges asserted in these cases, as urged in the dissents of
Justices BOYLE and WEAVER, strikes me as misguided.

[2] MCL 750.317; MSA 28.549.

[3] Even among the circumstantial evidence, there was substantial evi-
dence that did not conform to the prosecution's theory. In particular, the

Defendant shared his house with his brother, Gregory Gearns. Gregory was present in the house when it was searched and may have been participating in efforts to clean it. The prosecution wanted to call Gregory Gearns as a witness, and offered him immunity from prosecution as an accessory after the fact.[4] Gregory Gearns, not surprisingly, also had counsel representing him during the proceedings.

When the prosecution attempted to call Gregory Gearns, there was an extended discussion between the trial court and the attorneys, including, primarily, the attorney representing Gregory Gearns. Counsel advised the court that he believed the immunity offered was insufficient to protect his client from having his testimony used against him. Counsel therefore advised the court that the witness intended to assert his Fifth Amendment privilege. Eventually, it became clear that the prosecution would offer no further immunity and that the witness would continue to assert the privilege. The court then found the privilege to be invalid, and ordered the witness to testify or face contempt charges. Significantly, the focus of

---

trunk of the defendant's car, allegedly used to transport the body to the wooded area where it was dumped, contained two types of blood stains. One, type O, matched the defendant. The other, type A, matched *neither* the defendant nor the victim. The victim was type B, a type not found in the trunk, this despite the victim having been shot in the head at the residence, according to the prosecution's theory. The victim also had blood under his fingernails, which the medical examiner testified was consistent with a struggle and which also did not match the defendant or the victim. Additionally, the medical examiner determined that when the victim's body was found, he had been dead approximately three to four days. The body, in fact, was not found until six days after the defendant and the victim were last seen together.

[4] The prosecution theorized that the victim most likely was shot in defendant's basement. There was testimony that the defendant was partially disabled. The implication appears to have been that defendant may have required assistance to carry the body up the stairs and into the car.

the court and the prosecution was on the potential charge of accessory after the fact, despite counsel's insistence that immunity from such a charge was not sufficient to protect the witness.[5]

While these proceedings took place, appropriately, outside the presence of the jury, the witness was later called to the stand in front of the jury, apparently to assert the privilege and be held in contempt. (Counsel for the witness had argued that the court could not find the witness in contempt until he actually was placed on the stand and refused to testify.) Defendant's counsel objected to this procedure.[6] In view of this, it is readily apparent that no one actually expected that Gregory Gearns would testify. Indeed, he stated his name and address, and then refused to answer a question about with whom he resided. Following the trial court's overruling of an objection from the witness' counsel, and with the jury still present, the prosecution asked the witness whether he

---

[5] As can be gathered from the previous notes, it seems that there was sufficient evidence to support a conclusion that it was possible that someone else, perhaps with type A blood, was involved in the crime, and may have struggled with the victim before his death. While such evidence is circumstantial, and hardly conclusive, it is noted simply to make the point that the witness' counsel was not asserting a position that contradicted the evidence (i.e., if the witness was the other person involved in the crime, he might well be subject to liability greater than a charge of accessory after the fact, and, hence, would have a valid privilege despite the proffered immunity).

[6] Counsel for the witness also objected, apparently to the presence of the jury, on the basis of *People v Poma*, 96 Mich App 726; 294 NW2d 221 (1980). *Poma* followed *Giacalone* and *Dyer*, and specifically prohibited calling a witness to the stand in front of the jury, knowing that he would assert the privilege, regardless of its validity. The avenue taken in the dissents of Justices Boyle and Weaver wholly ignores what clearly has been settled law in Michigan for the past eighteen years, just as the trial court wholly ignored counsel's repeated warnings, on the basis of the case law, of the impending error.

had received immunity. No mention whatsoever was made of the limited scope of the immunity.

B

In *Giacalone*, the witness also was asked two questions, and likewise asserted the privilege in response to the second question. After stating his name, the witness in *Giacalone*, Loren Jolly, refused to answer a question regarding whether he recalled a specific date. The date in question was the date of the offense. We noted:

> When Jolly declined to answer whether he recalled "the date of August 15, 1967," the date of the offense, on the ground that his answer "may tend to incriminate me" the jury may have inferred that the answer if given would have been favorable to the prosecution. The jurors were informed through Kinsman's [an accomplice who became a prosecution witness] testimony that Jolly and Giacalone had committed the offense. Jolly was thus connected to Giacalone. An adverse inference from Jolly's refusal to answer may have carried over to Giacalone. [*Giacalone*, 399 Mich 646-647.]

Returning to *Gearns*, the witness likewise refused to answer a question that by itself might seem as harmless as asking about a particular date, but, when taken in the context of the trial, pointed directly to a material and important fact. The prosecution contends that the question was peripheral and, hence, the inference to be drawn by the jury was minimal at most. I disagree. The question, while purporting to deal with an initial matter, pointed directly to the witness' importance, that he was the defendant's roommate. Likewise, the prosecution's (correct) assertion that this fact was already before the jury does not compel a finding of harmlessness. Certainly, in *Gia-*

*calone*, the accomplice had already testified regarding the date of the crime, as had, most likely, the victim and the police. *Giacalone* teaches that it is not the establishment of the fact that would follow in response to the question that matters, but rather the negative inference the jury may draw from the refusal to answer that question. Most often, they are not the same, as demonstrated in *Giacalone*, where the actual answer to the question would only have determined whether or not the witness recalled a particular day.[7]

While this case does not involve the testimony of another accomplice, there certainly were sufficient facts to connect the witness to the defendant. In addition to being brothers, the witness and the defendant lived together. The jury already knew this. Any adverse inference to be drawn from the witness' refusal to testify naturally would be "carried over" to the defendant.

An additional component of this case, which actually makes the situation far worse than the one we

---

[7] It is here that I must specifically take issue with the dissent of Justice BOYLE. Under her view, all that might be "implied" from the refusal to answer the question is an acknowledgment that the witness resided with the defendant. The dissent has confused the inference the jury might draw with the potential responses to the question. On occasion, they might be very similar (i.e., if the question were "did you help the defendant kill the victim"). Generally, however, this is not so.

In *Giacalone*, were we concerned about the "inference" solely as Justice BOYLE defines it, we would have found only an unstated acknowledgment that the witness recalled a particular day, along with, given the intervening years before trial an implication that the day stood out in the witness' mind, or perhaps, that he had a good memory. Instead, we focused on the fact that "Michigan case law recognizes the danger that an adverse inference may be drawn from a *claim* of testimonial privilege." 399 Mich 646 (emphasis added). The inference is not of a particular positive answer to a single isolated question, but rather, as we noted, " 'the inference of defendant's guilt.' " *Id.* at 648, n 8, quoting *State v Vega*, 85 NM 269, 272; 511 P2d 755 (Ct App, 1973).

addressed in *Giacalone*, is the tainting of the jury with the knowledge that the witness had "immunity." No discussion was made of the limited scope of this immunity. Therefore, not only was the jury able to draw the inference feared in *Giacalone*, i.e., that the witness was involved in a crime, was connected to the defendant, and, thus, the defendant likely was involved too, but a more ominous inference was placed before the jury. Faced with a witness who resided at the scene of the crime, was intimately connected with the defendant, and refused to testify, despite having "immunity," another logical inference does not even apply with respect to the witness, as in *Giacalone*, but rather points directly to the defendant, i.e., if the witness is guilty, immunity would protect him, but because he will not testify, he must know what happened and be protecting his guilty brother.[8] Not only is the error in this case not harmless, it is in fact far more prejudicial than the error we found to warrant relief in *Giacalone*. On these facts, and faced with these inferences improperly placed before the jury, I cannot say that it is highly probable that the error did not contribute to the verdict, and hence would find reversal to be required.

### III

#### A. *THOMAS*

Defendant Thomas was charged with second-

---

[8] Note also that such an inference would deprive defense counsel of the opportunity to direct the jury's attention to Gregory Gearns as another likely culprit, an approach that otherwise could be within the range of sound trial tactics on these facts.

degree murder[9] and related firearm charges as a result of his participation in an apparent gang-related gunfight following a party. The prosecution's theory was that the defendant accidentally shot the victim, Curtis Madison, his friend, in the course of exchanging gunfire with rival gang members in a passing truck. Tarkeus Gee, a witness, was another friend of both the victim and the defendant.

As these persons, along with several others, were entering their respective vehicles, a truck drove by, firing shots at the group. At least two persons, the defendant and a Robert Jamerson, returned fire. Some testimony raised questions regarding whether one of the other members of the group, Demarcus Wesby, who was riding with Gee, might have been armed. Other testimony raised a question regarding the possibility of additional shots being fired from the area of a nearby building.

Of the many shots exchanged, ballistics evidence indicated that the shot that killed the victim came from the direction of the party, rather than the truck. The defendant was in line with the position from which the shot was fired, although the expert testimony could not rule out other potential sources, including the area of the nearby building. Jamerson's gun was of a different caliber and not the source of the fatal bullet. Defendant's gun was never recovered. There was no testimony to indicate that Gee had an active role in the gunfight.

Before the trial, the prosecutor and a detective visited Gee in jail, where he was incarcerated on unre-

---

[9] MCL 750.317; MSA 28.549. Defendant was convicted of the lesser charge of voluntary manslaughter, MCL 750.321; MSA 28.553, as well as two firearm charges.

lated charges. Gee made it clear to the prosecutor and the detective that, given his current circumstances, he saw no reason to testify and would not help them in making their case against defendant.[10] In making this point, Gee was so enthusiastic that the prosecutor later advised the trial court that the detective had to "restrain" him during the discussion.

In the course of the trial, Gee was brought to court to testify. Beginning with a court officer, he proceeded to make it clear to everyone he spoke to that he would not, in fact, testify. Eventually, this came to light, and, outside the presence of the jury, the court addressed the matter. The prosecutor felt it necessary to call Gee, while defense counsel suggested that Gee be advised of his rights and have counsel appointed. The court suggested a grant of immunity, with which the prosecutor agreed, as the easiest solution. The court then stated, despite a specific objection of defense counsel, citing *People v Poma,* 96 Mich App 726; 294 NW2d 221 (1980),[11] that, should Gee still refuse, the prosecutor would be allowed to call him.

The trial court called Gee to the stand, still outside the jury's presence, and Gee refused to testify. When the court attempted to clarify that it was a Fifth Amendment privilege being asserted, Gee agreed. The

---

[10] It is not at all clear exactly why the prosecution sought Gee's testimony. Discounting the defendant and the victim, there were six other people near the cars when the shooting occurred. One, Jamerson, who originally had faced the same charges as the defendant, testified in conjunction with a plea to a reduced charge of carrying a concealed weapon. The prosecution has not offered the Court any insight into what, if any, facts might have been contained in Gee's testimony that would not have been cumulative of testimony of other members of the group.

[11] See n 6.

court informed Gee of the immunity.[12] Gee continued
to make it clear that he would not be testifying.[13]

Despite defense counsel's frequent citation of
*Poma*, the court recalled the jury and allowed the
prosecutor's questioning of Gee to proceed. It did not
get far. In response to being asked his name, Gee
answered, "Well, I'm making sure—I want—I'm refus-
ing to say anything until I get a legal representative."
Other than once repeating that he was refusing to say
anything, that was the extent of Gee's testimony
before the jury.

B

I now turn to the analysis of harmlessness in this
case under the highly probable standard the Court
enunciates today. I begin by noting what is not pres-
ent in this case that was in *Gearns*. This case differs

---

[12] Defense counsel's persistent objections continued, here focused on
the lack of counsel for Gee.

[13] While the witness did cite the privilege, it could also be reasonably
concluded from the record that some level of sheer obstinance was
involved on the part of the witness, including a significant lack of respect
for the court. Nonetheless, it is clear from the record that no one could
have any real doubt of what Gee would be doing. This is precisely the sort
of situation contemplated by Judge RILEY in *Poma*.

> If the court concludes that the witness has no legitimate privi-
> lege, it should consider contempt penalties or other alternative
> remedies against the witness. Yet, with respect to the defendant,
> the court must proceed to determine if the witness intends to
> assert that privilege, whether validly or invalidly, at trial. If the inti-
> mate witness intends to claim the protection of the Fifth Amend-
> ment at trial, *there really is no way to prevent prejudice to the
> defendant absent barring that witness.* As other jurisdictions have
> noted, a cautionary instruction that no negative inference is to be
> drawn from the witness's taciturnity is ineffectual. [*Id.* at 732-733
> (citations omitted; emphasis added).]

Again, the inappropriateness of focusing on whether the witness *should*
testify, when it is obvious he will not, is clear from our past cases.

in that there seems to be no real question regarding Gee's culpability in the crime. It appears he was merely a passive observer. Nonetheless, the inquiry cannot end there. Recall that the jury was unaware of Gee's role, or lack of it, in the crime, and to them Gee was merely a witness related to the defendant, as seen below.

*Giacalone* focused on the connection between the defendant and the witness and the inherent flow of a negative inference drawn from one to the other. *Poma* also noticed the importance of this connection, hence its focus on "intimate" witnesses. In this case, the witness and the defendant were friends and members of the same group. While that alone, depending on the circumstances, might be sufficient to connect them in a way that a negative inference drawn from the witness could "spill over" to the defendant,[14] there is more involved in this case.

The context of this shooting was a gang-related dispute. Gang violence is laden with certain images, perhaps the most clear being, quite obviously, that a group enterprise is involved. The connection between gang members is quite similar to the accomplice connection of *Giacalone,* in perception even when not in fact, and hence it seems the testimony of Gee could well have spilled over to taint the jury's view of the defendant.

Additionally, the defendant notes, correctly, that certain imagery is inherent in society's perception of

---

[14] Recall for a moment the teaching of *Giacalone* regarding the certainty required concerning the "carrying over" of the negative inference from the witness to the defendant. "An adverse inference from Jolly's refusal to answer may have carried over to Giacalone." *Id.* at 647. We have never required a certainty that such an inference would result.

gang violence. Perhaps the strongest and most feared is that the gang members "stick together" in the face of law, violence, or anything else. It is possible, if not likely, that Gee's refusal, particularly given his disrespectful manner, could have fed those perceptions among the jurors. Even worse, the likely negative inferences would go beyond the initial inference, i.e., that Gee, a gang brother of the defendant, was involved and, hence, most likely so was the defendant, which alone was sufficient to support our decision in *Giacalone*.[15] Here the witness' stance, combined with his status as a fellow gang member, might well have elicited an "us versus them" inference in the jury, i.e., the witness will not help convict a gang brother, and because he knows that the defendant did it, he just will not testify at all, even if they put him back in jail. While there was no relevant testimony elicited from Gee's appearance, the potential prejudice to the defendant, as seen above, was extreme.

Among a collection of shooters in a gang-related death, defendant faced charges on a fair amount of circumstantial evidence, but, again, little physical evidence. There was certainly some evidence to support a conviction, but likewise there was some that a jury could have found to support an acquittal. The improper inferences to be drawn from Gee's refusal to testify ranged from incriminating to extremely prejudicial. Given that, in this case, I cannot say that it is highly probable that these inferences that may have been drawn by the jury from their improper exposure

---

[15] Recall, again, that the jury lacked the knowledge, conceded to us by the parties, that Gee was not actively involved in this crime.

to Gee's testimony did not affect the verdict. Accordingly, I would have to conclude that reversal was warranted on these facts.

IV

I agree with Justice BRICKLEY's opinion in regard to its adoption of the "highly probable" test, and hence reject the position advocated by Justice WEAVER's dissent. I disagree on the application of the "highly probable" test to these facts, given the underlying circumstances of the cases, and the ominous nature of the inferences that the jury may have impermissibly drawn, inferences that in both cases actually go beyond those that we initially feared in our decision in *Giacalone*.

It has been suggested by the dissents of Justices WEAVER and BOYLE that our decision in *Giacalone* was based solely on a "prosecutorial misconduct" basis.[16] I

---

[16] Justice WEAVER's dissent attacks the "implication" of Justice BRICKLEY's opinion that the prosecutor cannot "rely on the trial court's ruling regarding the validity of the privilege asserted." *Post* at 224. While she correctly states that, of course, no higher authority is available at the time, and that we should not require prosecutors "to develop a precognitive sense of whether the appellate courts will disagree with the trial court's ruling," *id.*, such hyperbole continues to miss the entire point.

While the prosecutor can rely on the trial court's ruling as accurate, that is only half the picture. The other half is whether the witness will in fact comply with such a ruling and testify. In these cases, both witnesses, one through counsel (asserting a legal position with merit) and the other through sheer obstinance, made it abundantly clear that they would not be testifying. The prosecutors had no need to possess extraordinary gifts, nor to consult with psychic advisors, to understand fully that the witnesses would not be testifying. To separate the reality of the witnesses' noncompliance from the ruling of the trial court, and claim a sound basis on the latter, ignores the very prejudice to be inflicted, which this rule, beginning with *Giacalone*, has sought to avoid.

Justice BOYLE's dissent attacks this view as ignoring "the prosecutor's ethical obligations as an officer of the court to put the truth before the jury." *Post* at 228. Of course, I do not purport to impinge on such a duty at

disagree, noting that in *Giacalone*, 399 Mich 645-646, we recognized the additional basis of difficulty in cross-examination, analogizing to our hearsay rules, without needing to invoke a constitutional analysis. Furthermore, to the extent one would credit the views of Justices WEAVER and BOYLE, such inappropriate conduct existed here. This Court said in *People v Dyer*, 425 Mich 572, 576; 390 NW2d 645 (1986), "the rule of law remains the same; a lawyer may not knowingly offer inadmissable evidence or call a witness knowing that he will claim a valid privilege not to testify." The law at the time of both these cases was stated in *Poma*. "When a judge determines at the evidentiary hearing that the intimate witness will

---

all. Nor, however, would I purport to involve it in support of a position where it is not the least bit endangered, as here.

In *Thomas*, Gee was but one of sixty-odd witnesses on the witness list. The prosecutor could advance only the same, unsupported, concern, as my sister, that the jury should hear from him, lest they retire to wonder, "What about Gee?" We have long since had instructions to alleviate such concerns, and, more importantly, even before this Court, the prosecutor has not offered the slightest indication that the absence of Gee would have prevented any part of the truth from coming before the jury. As noted, below, his testimony, if given, would have been cumulative of that of many other witnesses.

My sister offers the truism that "each man owes the court his evidence," *post* at 229. While this is generally correct, the remedy for a violation of a witness' duty to the court must lie against the witness, not the defendant. As to those reluctant witnesses whom Justice BOYLE fears will be encouraged not to testify, the court has contempt remedies available. They were, of course, ineffective in *Gearns*, because the witness was (1) legitimately in fear of far worse penalties were he to incriminate himself, and (2) eventually acquitted of the contempt charges. As to the already incarcerated Gee in *Thomas*, I suppose, unfortunately, that other such witnesses, equally lacking in respect for our courts or fear of consequences, may appear before our courts. Given, however, that it took no such decision from our Court to so embolden Mr. Gee, I fail to see how the decision today will have any effect on either the conduct of witnesses or the consequences they may face. Our focus today rests, as did the focus of Judge RILEY in *Poma*, on the consequences "with respect to the defendant." *Poma*, 96 Mich App 732.

either properly or improperly claim the protection against self-incrimination, he must not allow this witness to be called to the stand." *Id.* at 733. The fact that this Court had not, until today, spoken definitively on the application of the rule to an invalid privilege hardly gives a prosecutor or trial judge carte blanche to ignore clearly established and longstanding precedent from our Court of Appeals. Despite being reminded of this very precedent, that was exactly what happened in both these cases.[17]

V

Accordingly, I would reverse the decision of the Court of Appeals in *Gearns*, and affirm the decision in *Thomas*. In both cases the trial court committed clear error, and in neither case was it harmless under the standard we enunciate today.

KELLY, J., concurred with CAVANAGH, J.

WEAVER, J. (*concurring in part and dissenting in part*). I agree with the result of the lead opinion and join in the constitutional analysis. I write separately to dissent from part IV and concur, for different reasons, in part V.

---

[17] I pause to note that, while the prosecution in these cases has argued a lack of knowledge that the witness would assert the privilege, they have failed to be at all convincing. The arguments here center on the possibility that the presence of the jury might somehow compel the witness to testify, despite his (or his counsel's) repeated statements to the contrary that no such thing would occur. Gee made clear that the court could "give me some more years, it wouldn't bother me." Counsel for Gregory Gearns made clear his client had a valid fear of incrimination and would continue to refuse to testify, despite the threat of contempt (the sanctions for which are substantially less than those for the crimes for which Gregory Gearns was potentially exposed to liability).

I

In part IV, the lead opinion asserts that evidentiary error occurred. The lead opinion would hold that it was error in each case for the prosecutor to call witnesses intimately connected to the crimes at issue, knowing that those witnesses would assert their Fifth Amendment rights, validly or invalidly.

I disagree with this because I am convinced that error occurs only when the privilege asserted has been ruled to be valid by the trial court. The seminal case in this area is *People v Giacalone*, 399 Mich 642; 250 NW2d 492 (1977). There the defendant alleged that the prosecutor acted improperly in calling a witness, knowing that the witness would claim the privilege against self-incrimination. Citing the American Bar Association standards, this Court held that "[a] lawyer may not knowingly offer inadmissible evidence or call a witness knowing that he will claim a valid privilege not to testify." *Id.* at 645.

The evidentiary rule established by *Giacalone* is grounded in professional misconduct. If the prosecutor has come to learn that the witness plans to claim a privilege, the proper procedure would seem to be to ask the court to rule on the validity of the privilege. The court should conduct the hearing outside the jury's presence in order to avoid jury taint. If there is a valid privilege, the prosecutor could not call the witness unless nonprivileged information could be and was elicited, thereby giving purpose to the witness' appearance other than creation of the unwanted inference that the witness' testimony would undercut the defendant's claim of innocence. If the privilege is found invalid by the trial court, the prosecution has every right to put the witness on the stand, expecting

the witness to comply with the obligation to testify. The trial judge should limit examination to that necessary to limit the witness' unavailability, and, if requested, issue a jury instruction that the jury is not to infer anything against the defendant from the witness' failure to testify.

The lead opinion also states that the validity of the privilege as determined by the trial court is not absolutely controlling in determining whether the prosecutor acted in good faith. I reject the implication of the lead opinion that the prosecutor cannot rely on the trial court's ruling regarding the validity of the privilege asserted. The prosecutor has no higher authority available at the time, and this Court should not require the prosecutor to develop a precognitive sense of whether the appellate courts will disagree with the trial court's ruling.

The lead opinion disregards the fact that the evidentiary error in question is grounded in professional misconduct, and says that "the validity of the privilege is not necessarily controlling in this evidentiary error analysis." *Ante* at 197. In so saying, the lead opinion relies on the idea that "[i]f the concern is the prejudice to the defendant, then why focus on the validity of the witness' constitutional rights?" Relying on the prejudice to the defendant, however, confuses whether the error was harmless with whether error existed.

In *Giacalone*, this Court found there was error because the prosecutor acted improperly by calling a witness, knowing that the witness had a valid privilege that would be asserted. Absent knowledge of a valid privilege, however, there is no unprofessional

conduct on the part of the prosecutor, and hence no error.

In the instant cases, it is clear that neither witness was asserting a valid privilege. In *Gearns*, a hearing was held outside the presence of the jury before the witness was called to the stand. At that time, the trial judge held that the witness' claim of privilege was not valid. In *Thomas*, the trial judge questioned the witness outside the presence of the jury, before the witness took the stand, and determined that the witness had no valid privilege to refuse to testify. Thus, I would find that in neither case was there evidentiary error.

II

The finding that there was no evidentiary error renders the discussion of harmless error unnecessary. However, I briefly address that issue because I disagree with the standard of review utilized by the lead opinion.

As I stated in *People v Mateo*, 453 Mich 203; 551 NW2d 891 (1996), I believe that the proper standard for preserved, nonconstitutional error is set out in MCL 769.26; MSA 28.1096. The defendant should have the burden of showing why the judgment should be overturned. There is a presumption that the error is harmless, and the judgment shall not be overturned "unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice." *Id.*

Since I believe there was no error, I concur with the lead opinion in finding that what it finds to be error is harmless.

Taylor, J., concurred with Weaver, J.

Boyle, J. (*dissenting*). I join part I of Justice Weaver's opinion. Because I would find that there was no constitutional or evidentiary error in these cases, it is not necessary to reach the issue left open in *People v Mateo*, 453 Mich 203; 551 NW2d 891 (1996). Moreover, if there were error, it would be harmless under any test. Given this fact, the majority's motivation is obvious; it has simply used this case as a vehicle to adopt the high-probability standard, thereby rendering any meaningful exploration of one of the most important questions in our jurisprudence an exercise in futility. I otherwise agree with Justice Weaver's reasoning and result and write separately to add only these observations regarding the lead opinion by Justice Brickley.

If I understand the lead opinion, there is no constitutional doctrine applicable to this case. Nor is there evidentiary error of the type referenced in *Namet v United States*, 373 US 179; 83 S Ct 1151; 10 L Ed 2d 278 (1963). Further, neither *People v Giacalone*, 399 Mich 642; 250 NW2d 492 (1977), nor *People v Dyer*, 425 Mich 572; 390 NW2d 645 (1986), in terms apply, because each involved the calling of a witness for the purpose of having the witness invoke a valid Fifth Amendment privilege. In short, as far as I can determine, *Commonwealth v DuVal*, 453 Pa 205; 307 A2d 229 (1973), is the only court of last resort to hold that the prosecutor commits error calling a witness who has no privilege to refuse to testify. The rule of this case, therefore, is that prosecutors commit an ethical violation and are presumably subject to discipline when they merely call a witness to the stand who just does not want to get involved.

Aside from the lack of wisdom in creating a bright-line rule that places the power of determining who will be called to testify in the hands of recalcitrant witnesses, the Court simply assumes it has the authority to create an ethical rule for the conduct of prosecutors, to call it an "evidentiary rule," and to assert that violation is error.

The need for probative evidence is the paramount concern of the system. Any rule that undermines that objective bears a heavy burden of justification by reference to another value of equal or greater importance. Even where there is a potentially valid privilege, as Professor McCormick has observed, a multifactor analysis is applied to determine whether error is committed when a prosecution witness is questioned before the jury and validly invokes his privilege.

> Among the relevant considerations are the prosecutor's certainty that the witness will invoke the privilege, the number and nature of the questions as to which the privilege is invoked, whether other evidence has been introduced on those matters as to which the jury might draw an inference from the witness's invocation of the privilege, and the giving—and likely effectiveness—of an instruction to the jury to draw no inference from the witness's action. [1 McCormick, Evidence (4th ed), § 137, p 513.]

Given that the prosecutors in these cases acted in good faith, there can be no finding of "evidentiary" error on the basis of prosecutorial misconduct. Simply stated, if the privilege asserted is valid, because the judge just ruled it was valid, there is no ethical violation when the witness is merely called to the stand. Thus, there is no error based on the prosecutor's breach of ethics.

While making much of the prosecutor's ethical obligation not to offer inadmissable evidence or call a witness knowing he will claim a *valid* privilege, the lead opinion ignores not only the trial courts' rulings on the validity of the privileges asserted, and the prosecutor's good faith, but also the prosecutor's ethical obligations as an officer of the court to put the truth before the jury. *Ante* at 196.

*Giacalone* turned on the Court's acceptance of the reference in the ABA Project on Standards for Criminal Justice[1] to the ethical rule that "[a] lawyer may not knowingly offer inadmissable evidence or call a witness knowing that he will claim a valid privilege not to testify." *Giacalone* at 645. In these cases, neither prosecutor knew that a witness would claim a valid privilege because the judge ruled otherwise. Moreover, neither acted in an unethical manner in any way. Thus, Justice BRICKLEY's opinion takes precedent that rests on the dual concerns that a prosecutor should not force a witness to claim a valid privilege and that a jury may draw inferences that are impermissible from such exercise and converts it into a rule that the prosecutor may not call a witness who has no privilege to refuse to testify because the jury might hold it against the defendant.

Concern that the witness' refusal to testify might play a role in the jury's deliberations harmful to the defendant is speculative, not evidentiary. In *Gearns*, the prosecutor asked the witness, "Who do you reside

---

[1] The current ABA Standards for Criminal Justice, Standard 3-1.1, Prosecution Function and Defense Function (3d ed), p 3, specifically state that "[t]hese standards . . . are not intended to be used as criteria for the judicial evaluation of alleged misconduct of the prosecutor to determine the validity of a conviction. They may or may not be relevant in such judicial evaluation, depending upon all the circumstances."

at that address with?" The only inference that could have been drawn from that question is that the witness lived at the address with defendant, an inference that would have little or no probative force in the case against the defendant and that was established independently. The prosecutor did not ask any substantive questions after the witness refused to answer that question, and any inference from the failure to answer that question would not add "critical weight" to the prosecutor's case within the evidentiary approach of *Namet. Id.* at 187. The inference could not have supplied any missing link in the evidence because other witnesses testified that the defendant and the witness lived together and were observed cleaning the floor. Thus, as in *Namet, supra* at 189, the case is not one "in which a witness' refusal to testify is the only source, or even the chief source, of the inference that the witness engaged in criminal activity with the defendant."

In *Thomas*, the witness refused to answer any questions whatsoever, " 'refusing to say anything . . . .' " *Ante* at 179. As in *Gearns*, the conclusion that an adverse inference reasonably could be drawn from the testimony is bald speculation.

A jury is entitled to know that a witness has been produced and will not testify, rather than be told that it is not to speculate on the reasons why the witness is not present. Contrary to the principle that each man owes the court his evidence, the majority creates a rule that makes it easier to avoid that responsibility, that may result in an adverse inference against the prosecutor, and that deprives the jury of the full story.

[B]eyond the power of conventional evidence to support allegations and give life to the moral underpinnings of law's claims, there lies the need for evidence in all its particularity to satisfy the jurors' expectations about what proper proof should be. . . . "If [jurors'] expectations are not satisfied, triers of fact may penalize the party who disappoints them by drawing a negative inference against that party." Expectations may also arise in jurors' minds simply from the experience of a trial itself. The use of witnesses to describe a train of events naturally related can raise the prospect of learning about every ingredient of that natural sequence the same way. If suddenly the prosecution presents some occurrence in the series differently, as by announcing a stipulation or admission [or that they are not to speculate about why a named and produced eyewitness is not present], the effect may be like saying, "never mind what's behind the door," and jurors may well wonder what they are being kept from knowing. A party seemingly responsible for cloaking something has reason for apprehension. . . .

A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it. People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard. A convincing tale can be told with economy, but when economy becomes a break in the natural sequence of narrative evidence, an assurance that the missing link is really there is never more than second best. [*Old Chief v United States*, 519 US 172, 188-189; 117 S Ct 644; 136 L Ed 2d 574 (1997).]

A rule depriving the jury of knowledge requires a compelling justification. There being no right to refuse to testify in these circumstances, no ethical violation by the prosecutor, and no legally cognizable prejudice to the defendant from the witness' recalci-

trance, compelling justification is not present. Because the result will make it easier for reluctant witnesses to withhold their testimony, I dissent.